Shults v. State.

---

CUYLER SHULTS v. STATE OF NEBRASKA.

FILED JUNE 30, 1893.    No. 5527.

1. **Homicide:** INSANITY AS DEFENSE: NON-EXPERT WITNESSES. Only such intimate acquaintances of a person accused of crime as have seen him almost daily for several months preceding the date upon which the alleged crime occurred, are competent as

34

non-expert witnesses to testify as to the sanity or insanity of the accused.

2. ——: ——: ——. Such testimony, however, must be strictly limited to such sanity or insanity, and confined to those occasions upon which the witness testifies to having observed the conduct and appearances of the individual whose sanity is the subject of inquiry.

3. ——: ——: ——. The rule permitting a non-expert witness to testify as to the sanity or insanity of a party whose legal accountability is the sole matter in issue does not allow such witness to testify that at a certain date such party knew the difference between the right and wrong of an act at that time committed by him.

ERROR to the district court for Hall county. Tried below before HARRISON, J.

*W. A. Prince* and *W. H. Thompson,* for plaintiff in error.

*George H. Hastings, Attorney General,* and *Charles G. Ryan,* for the state.

RYAN, C.

Cuyler Shults was convicted in the district court of Hall county, Nebraska, of the murder of J. P. Farr, charged to have been committed in said county on the 28th day of August, 1891. There was no question that said Farr came to his death at the time and place charged from the effect of a gunshot wound inflicted upon him by said Shults. The defense was insanity, of which there was much evidence. It was shown that the accused was wounded in the right side of the head by a fragment of a shell on the 6th of April, 1862, at the battle of Shiloh; that since his discharge from the federal army the accused has become gradually morose, at times almost savage towards the members of his family; that he has become year by year quarrelsome at times and distrustful of his family and friends; that he frequently was cruel towards his cattle and horses; that

when crossed by either man or beast he became much irritated, and on such occasions threatened to take the life of the animal or man by whom his displeasure was excited; that he sought solitude and talked much to himself; that a medical examination showed that his left side was partially paralyzed; that his sleep was fitful; that owing to a continuous pain in the region of the above mentioned wound the accused habitually slept with his hands locked across his head; that he seized frequently the bed clothes in his teeth and bit and tried to tear them, at the same time gritting his teeth, and on one or two occasions it was testified that he foamed at the mouth.    There was evidence that the night before the commission of the homicide the accused was agitated beyond reason by an act of Farr, which accused considered as an outrage toward himself and his family; that in speaking of it he shed tears on that day, and on the same day as, and just previous to, the killing of Farr, saying at each time mentioned that he had to kill Farr.    Other evidence in the same direction was given and there was also evidence of epilepsy of accused's mother. The wife of the accused testified that accused said that by the use of intoxicating liquors the pain which continuously existed in his head was deadened; and she further testified as of her own observation that such use enabled him to sleep when otherwise he could not.    There was medical expert testimony that periodic insanity of a sub-acute character was indicated by the symptoms of the prisoner.

The state insisted that the above conduct of the accused was owing to a violent temper, often aggravated by intoxication, but that no insanity existed.

As the sole contention in this case was as to the sanity and ability of the accused to discriminate between right and wrong on the 28th day of August, 1891, we shall limit our observations to that and incidental inquiries, giving the testimony of the witnesses on rebuttal at considerable length.    (To a proper understanding of this evidence

it is proper to explain that the accused for some years pre-
vious to the homicide resided between eight and nine miles
in a southerly direction from Grand Island.)

James McKnight testified that he had known the accused
about four years; lived within about a mile and a half of
the place of residence of accused; was middling well
acquainted with him; saw him pretty often but could not
say just how often; sometimes once or twice a week, some-
times would not see him for a month, perhaps; saw him
quite frequently during the summer previous to that in
which the evidence was given, and saw him and talked
with him on the 27th of August, 1891. That during the
time witness saw the accused he talked with him about as
frequently as one neighbor would with another, but never
had any business transactions with him. Had seen him
drink in Grand Island, and once saw him under the influ-
ence of liquor when he was coming home from Grand
Island, which was August 27, 1891. Following this tes-
timony the witness was asked:

Q. I will now repeat the question. You may state, Mr.
McKnight, from your knowledge of Cuyler Shults, gained
by your acquaintance with him as you have stated, whether
in your opinion he was sane or insane on the 28th of
August, 1891.

A. I would say he was as sane as any man as far as I
could see.

On further examination this witness testified that he had
never noticed any peculiar acts of insanity about the ac-
cused.

John Schwim testified that he resided at Doniphan, Ne-
braska, where he had lived for about six years; had met
the accused in Mr. Wolbach's store, where witness was
book-keeper, about seven years before the date of the trial;
since that would sometimes see him every week, and some-
times once a month; during the preceding spring, on ac-
count of accused's sickness, he had not seen him during a

period of two or three months.   Witness further testified that his occupation was that of cashier of the bank of Doniphan; that for the last three or four years the accused had owed the bank some money, and the bank had generally some collection notes against the accused, who was accustomed to visit the bank perhaps once a month; sometimes there would be a lapse of two or three months. Witness testified that he had seen the acccused about a week or two before the 28th of August, 1891 ; accused was then at the bank talking with witness; his condition was about as usual ever since witness had known him.   Witness testified that he had passed the house of accused a couple of times, talked with him about fishing—a general conversation; this was in July or August, 1891.   The habits of the accused were irregular; witness had never seen the accused take a drink, and in relation to being under the influence of intoxicating liquors, seemed always to be the same, that is, witness could not distinguish it if he was under the influence of liquor.   Upon this preliminary examination, the following question was propounded to the witness:

Q. Now, from what he appeared to you on the 28th day of August, and from what you have known of him during all the time during the last seven years, in your judgment or opinion, was the man sane or insane on the 28th day of August, 1891?

Objection duly made, overruled, and exception taken.

The court remarked : "I think he may answer now; it is pretty close, though."   Whereupon witness answered:

A. I cannot form an idea if he had been sane or insane.   Mr. Shults was eccentric.   I cannot draw the line between insanity and eccentricity; I am no expert.

Q. What does his eccentricity consist of, Mr. Schwim?

A. Well, first, he had a mania for lying.

Q. What else, if anything?

A. And telling stories in general.

Q. What else?

A. Oh, he had—I don't think he ever liked to work very much; he wanted to go fishing and hunting; it was one of his passions.

Q. That was one of his eccentricities, was it?

A. Well, it was more of a passion, I should think, and lying I should class as an eccentricity. A man may have a passion for lying the same as he may have for stealing or kleptomania. I don't know as there is any man that has the habit of lying when it don't do any good.

Q. From your knowledge of this man during these seven years, and the many times you have met him and talked with him, with all of his eccentricities, taking them all together, what, in your opinion, was the man's ability to judge between right and wrong in this particular crime committed on the 28th of August, 1891?

Due objection was made, overruled, and exception taken. Witness answered:

A. I think when—of course I don't know what state his mind was in at that time—the day he committed the crime, but from the appearance he gave me the last few times I think he could distinguish between right and wrong.

Mr. Henry Denman testified on rebuttal that he lived eleven miles southwest of Grand Island at the time of testifying, where he had lived over twenty-two years; had known Cuyler Shults between twelve and fifteen years, and during the time of his acquaintance with Shults had seen him two or three times a week, sometimes might be a month, probably not more than once or twice a month, and again witness might not see him for two months. During the time of his acquaintance with the accused witness had held the office of sheriff and jailer of the county for two years; had seen the accused in the jail perhaps three or four times during those two years, which were 1882 and 1883. Since the last date above given witness had lived on his farm in the neighborhood of two and

a half miles from the residence of the accused, during which time he had seen him every two or three days; often saw him on the road and sometimes in the village of Doniphan, sometimes in the city of Grand Island. Sometimes he would see him once a week and sometimes it might be two or three weeks; when witness saw the accused in Doniphan he would be doing considerable talking, and drank considerable liquor; had met the accused a great many times in Grand Island, and the accused seemed, and was, under the influence of liquor; when in this condition he was more boisterous than when sober; was talkative and violent; when under the influence of liquor Mr. Shults' eyes seemed to be glary—had a devilish appearance; devilish disposition seemed to have possession of him. When sober the witness could observe no incoherence in the speech of the accused, but when drunk the accused's tongue would be thick and numb, and he could scarcely talk. Witness testified that he did not see the accused very often during the summer of 1891; probably met him a half dozen times in the fore part of the season—June and July—on the road from accused's place to Doniphan. Witness testified that he was at the home of the accused between the 25th day of July and the 15th of August, 1891, between 9 and 10 o'clock in the evening. After witness had been there ten or fifteen minutes accused came from the river where he had been attending to his fish hooks; witness conversed with him; accused did not act any differently from any time when witness had met him when he was sober.

Premised with this testimony, the following questions and answers appear in the record:

Q. Now, Mr. Denman, from your knowledge of him as you have stated, was he in your opinion sane or insane in August, 1891?

Upon the suggestion of the court that the question be confined to the acquaintance of the witness with the accused, the question was put in the following form:

Q. Mr. Denman, from this knowledge and acquaintance with the defendant, was he during the time you have known him, sane or insane, in your opinion?

Due objections were made, overruled, and exceptions taken.

A. My opinion is he was sane.

Q. From your knowledge and acquaintance with him during the time you speak of did he, in your opinion, know the difference between right and wrong?

A. Yes, sir.

Q. From your knowledge of him during the time you have known him, could he in your opinion, distinguish the difference between right and wrong in the particular act charged in this information, namely, the killing of J. P. Farr on the 28th of August, 1891?

Due objections were made to this proposed evidence, which were overruled, to which the defendant excepted.

Witness answered:

A. Yes, sir.

John W. Denman testified to an acquaintance with the accused and opportunities of observing his conduct, much to the same effect as detailed in the evidence of the last witness. He said that he saw the accused on the 27th day of August, 1891, going to Grand Island about 11 o'clock in the forenoon, when he had some talk with the accused, who told him about his trouble with Mr. Farr; that he saw the accused the same day about sunset; that at the last named time the accused was under the influence of liquor; saw him the next day after the homicide, when the accused said to him good bye; that accused never expected to see witness again; that witness remarked to him that he (Shults) would get into the "jug" over to Grand Island. No further conversation was had at that time; that during the witness's acquaintance with the accused he lived within about three miles of him.

After this preliminary testimony the witness was asked the following question:

Q. Now from your knowledge and acquaintance of this man for the number of years that you have known him, state, Mr. Denman, what was your opinion of this man in regard to his ability to judge between right and wrong of this particular act committed on the 28th of August, 1891?

After the overruling of objection and taking of exception witness answered:

A. Well, I should judge he was able to judge between right and wrong.

John Gallagher testified that at the time of giving his testimony witness lived seven and a half miles south of Grand Island, where he had lived for about a year; previous to that time he had lived one mile north of Doniphan and a mile east for four years; prior to that time he had lived six miles east of Doniphan, or rather five miles east of Doniphan and one mile south. He detailed about the same means of observation, and the same intimacy of acquaintance as has been stated by the two witnesses whose evidence immediately precedes that of this witness. Witness further stated he had always considered the conversation of the accused just as rational as his own; never saw him take a drink of liquor in his life; every time witness met the accused coming from toward Grand Island accused seemed to be intoxicated; at such times he talked just as any other man would when the worse for liquor; sometimes he would be drunk almost and lying in the bottom of the wagon, letting his horses proceed homeward without any restraint at all; had seen the accused under the influence of liquor in Grand Island; noticed no difference in him when intoxicated in appearance from the appearance of other men when intoxicated; sometimes under such circumstances he was profane and abusive; sometimes, whether intoxicated or not, he was angry and excited; one time in 1889, while surveying, noticed such conduct of the accused when he was sober, the defendant then accused witness of bringing Mr. Shaw, "the damn big Scotchman,"

as he called him, out to cheat him out of his land; warned witness not to come near him or witness might look out for the hatchet which was in the hands of the accused; at that time the accused ground his teeth and looked like an angry man; the expression in his eyes was one which witness had noticed many times when accused was excited; he had a flashing eye. When talking the accused would put the corner of his handkerchief or necktie into his mouth; on such occasions he would talk rational, however; never heard him give any reason for this conduct. Witness saw accused in August, 1891, when accused was brought before the commissioners of insanity; met him on the way to Grand Island; at that time had conversation with him and accused talked as he always did; said he had been over before the said commissioners, but said that the commissioners could not keep the accused long because he just told them that if he was insane they would have to take care of him, and if he was not insane they would have to turn him out and let him go; accused told witness at that time that it was a damn good scheme for to git rid of him. The defendant accused Mr. Yonker of having instituted the proceedings before the commissioners of insanity. (Yonker is his son-in-law.) At that time accused told witness that Yonker could not stay on his place. Subsequently to that time, and before the homicide, witness had met the accused and talked with him for probably an hour or an hour and a half; could see no difference in his talk or conduct from what it ordinarily was. This last conversation witness fixed as on the 26th of August, 1891; it was just a general conversation in regard to the weather, the old trouble of cutting a fence; accused said if they would rebuild it and deprive his family from going to school and provision to live on he would cut the fence down; said they could not ride over him any longer, or if they did he would shoot them; did not say who he referred to. Witness was then asked the following question:

Q. Mr. Gallagher, from your acquaintance with him, as you have detailed, you may state whether or not in your opinion he was sane or insane during the time you have known him?

To this there was proper objection, which was overruled and exception taken.

The witness answered: "I always thought he was a sane man."

Zenas H. Denman testified to facts showing about the same means of observation and acquaintance with the accused as has been stated in the testimony of the three last named witnesses. The witness further stated that the last time he saw the accused was about five or six weeks prior to the homicide, that is the last time he had a talk with him. He was then asked this question:

Q. Mr. Denman, from your acquaintance with him, as you have detailed, did he, in your opinion, know the difference between right and wrong as to the killing of J. P. Farr on August 28th, 1891?

He answered:

A. From the last talk I had with him, I think it was about six weeks prior to the shooting, I should say he would know right from wrong.

Dr. Sutherland testified as to the indications of certain phenomena respecting the accused which had been detailed by the other witnesses.

John Allan testified that he was clerk of the district court of Hall county, and *ex-officio* clerk of the board of commissioners of insanity; that defendant Shults was before the board on the charge of insanity on July 22 or 23, 1891; that he attended the inquisition held as to the alleged insanity of defendant Shults; that witness talked with accused about his condition and that accused said if he was insane then he always had been; claimed that his family was plotting against him; that he had had trouble with Yonker; also with his own son John; that accused's

wife was very deceitful, when any person was around the
the house she was pleasant and nice to him, but as soon as
they were gone she abused and aggravated him; that he
wanted to subpœna twenty-five witnesses from Grand Island
and the neighborhood where he lived to prove that he was
not insane; this was about 8 o'clock in the evening; that the
commission did not want to put the county to a great deal
of expense, and commenced and concluded to hold the ex-
amination that evening; it was held in the county super-
intendent's office; Mr. Shults handled his own case and
made the witnesses own up to nearly everything he had
told the commissioners; that the commissioners turned
Mr. Shults over to the sheriff until next morning at 10
o'clock; the accused talked a great deal, repeated the as-
sertions he had made as to his family, and commenced to
tell war stories among other things; did not see the ac-
cused after that time before the 28th of August; had
known Cuyler Shults for ten years, during which time
witness had seen him on an average probably of about
once in two months in Grand Island; sometimes the ac-
cused came in to have witness make out his pension papers,
affidavits, etc.; sometimes witness saw him on the street;
accused talked a good deal, was generally under the influ-
ence of liquor, sometimes a good deal under the influence
of liquor; was full of talk, made rather rough remarks and
jokes; did not particularly notice his eyes; had noticed him
when he was angry, when he would be a little more talka-
tive than usual; talked rather loud and in rather a discon-
nected manner; witness did not have a great deal of talk
with him when he was intoxicated; would get through with
him as soon as possible; merely required him to answer
questions to get his papers in proper shape and signed;
talked with him on the streets probably three or four times
a year.    Witness was then asked:

Q. Now, from your acquaintance with him as you have
detailed, was he in your opinion sane or insane during the
time you knew him?

After the overruling of an objection and exception taken thereto, witness answered :

A. Sane, but not very well balanced.

He was then asked :

Q. Mr. Allan, from your acquaintance with him as you have testified, did he in your opinion know the difference between right and wrong on the 28th of August, 1891, when he killed J. P. Farr ?

Upon proper objection being overruled and exception taken, the witness answered:

A. I think he did, he seemed to know the penalty of the crime he had committed.

Mr. Glanville, another member of the board of commissioners of insanity, testified substantially as above in respect to the proceedings had on July 22 or 23, 1891.  He was not asked his opinion as to the sanity or insanity of the accused, or his ability to discriminate between right and wrong.

George Grantham testified that he lived three and a half miles south of Doniphan ; had known the accused for twenty years; first knew him in Butler county, Nebraska, where he lived in the same house with witness; might have been for four or five months; during that time he appeared all right; in speaking, his manner was very quick, spoke quicker than some people do ; did not drink much then as he has lately, because he was poor at that time; would get mad very quick ; after he left Butler county witness next saw him at Doniphan, Nebraska, about twelve years before the date of the trial, when he was living on a farm on the Platte river; witness and the accused had had a little trouble in Butler county, and the accused wanted to make it up with the witness every time they met, and especially when the accused had had liquor; at such times the accused terribly wanted to get into conversation with witness and make it up, and said that if witness would come down home with him accused's wife would make witness some

candy—he was somewhat intoxicated at the time. While at Doniphan witness had seen accused around the corner of a building drinking out of a bottle once or twice. After accused came to Hall county, Nebraska, witness saw him once in two or three weeks, or once a month just as it happened; had seen accused after accused had said his wife would make witness some candy; sometimes he was sober and sometimes he was not. Witness had never seen accused excited or angry since he had been in Hall county; witness had seen accused sometime before the killing of J. P. Farr, but could not say how long previous to that date; could not say in what year. Witness was then asked this question:

Q. Now, Mr. Grantham, from your acquaintance from the time you first met him in Butler county, was he in your opinion sane or insane during the time you have known him up to the 28th of August, 1891?

Objection was duly made to this question, which was overruled, and exception taken. Witness then answered:

A. Well, sir, I should say he was a sane man, sir.

Witness was then asked this question:

Q. From what you know of him from the time you first knew him in Butler county up to the 28th day of August, 1891, did he, in your opinion, know the difference between right and wrong as to the killing of J. P. Farr on August 28th, 1891?

After the overruling of due objection to this question, to which exception was taken, the following answer was made by the witness:

A. I should judge he did know right from wrong.

It will scarcely escape observation that all the preliminary inquiries made were introductory to two questions: First, whether the accused was sane or insane, in some instances on the day of the homicide, in others during the acquaintance of the witness with the accused; second, whether on the day of the homicide the accused could judge between right and wrong in respect thereto. This

evidence was in no instance given by an expert, hence the following quoted language is applicable thereto: In *Schlencker v. State*, 9 Neb., 250, occurs the following language: "The defense of insanity being interposed, and several witnesses having testified of strange conduct on the part of the prisoner shortly before and on the day of the homicide, a number of witnesses, not experts, however, were examined by the state as to his conduct and appearance in their presence on sundry occasions both before and shortly after the shooting occurred. The opinions of these witnesses as to the prisoner's mental condition, based upon what they had personally observed, and then detailed to the jury, were admitted in evidence under the objection that they were incompetent evidence. That none but medical experts shall be permitted to give to the jury their opinions, based upon the testimony of other witnesses on the question of insanity, is, we believe, universally held. In this case, however, the witnesses were the neighbors and acquaintances of the prisoner, knew him well, and their opinions were formed from seeing and observing him for several months almost daily. Opinions formed under these circumstances, although not those of medical men, are, nevertheless, entitled to respectful consideration by courts and juries, and we have seen no satisfactory reason for holding them to be incompetent evidence."

In *Polin v. State*, 14 Neb., on page 546, is found the following language: "Non-expert testimony on the question of the prisoner's alleged insanity was admissible. The witnesses had known the prisoner for years; were more or less intimately acquainted with his habits and practices, and formed their opinions from facts within their own knowledge. Their testimony was clearly within the rule announced in the case of *Schlencker v. State*, 9 Neb., 241."

In *Burgo v. State*, 26 Neb., on page 643, this court said: "It is probable that there is no better proof of the sanity or insanity of a person than the testimony of those who

are intimately acquainted with him and have observed his conduct for months or years."

The inquiry as to sanity or insanity is as to a fact, "and the expressed opinion of one who has had adequate opportunities to observe his conduct and appearance is but the statement of a fact; not indeed a fact established by direct and positive proof, because in most if not all cases it is impossible to determine with absolute certainty the precise mental condition of another, yet being founded on actual observation, and being consistent with common experience and the ordinary manifestations of the condition of the mind, it is knowledge, so far as the human intellect can acquire knowledge upon such subjects." (*Connecticut Mutual Life Ins. Co. v. Lathrop*, 111 U. S. Rep., 620.)

To testify as above indicated, it should be affirmatively shown that the non-expert witness has had sufficient acquaintance and means of observation to testify as to sanity or insanity as to any other physical fact. In support of the ruling of the court in excluding the opinion of Campbell, a witness of the class now under consideration, counsel for the defendant in error in their brief use the following apposite language: "The doctrine is well settled, in accordance with the current of authority, that the witness who is not a medical expert, may, in certain cases where the question of insanity is raised, and the state of mind of a person is the subject of investigation, state his opinion, but to warrant this being done, and such opinion being received in evidence, it must first be shown that the acquaintance of the witness with the party, whose sanity is questioned, is of an intimate character and his associations with him of sufficient duration to justify him in forming a correct judgment as to the intellectual status of the person whose sanity is under investigation." This rule properly excluded the testimony of Campbell, and with the same effect should have been interposed against the evidence of some of the witnesses on rebuttal, notably that of George

Grantham. The evidence should, to qualify a non-expert witness to testify as to a condition of sanity or insanity, show an acquaintance with that condition, which, in the instance last cited at least, was not sufficiently done. Not only so, but evidence of such condition must be confined to periods when there was sufficient opportunities for observation. It will readily be seen that some of these witnesses showed a disconnected acquaintance with the prisoner extending through several years, yet they testify as to the condition of the accused apparently in no way limited by or having relation to the periods covered by such observation. This could hardly be considered evidence pertinent to the existence of a fact, established though it was by observation. It may have been an inference by the witness deduced from the presumed continuance of the condition which the witness had observed, but that is not within the rule, or the reason of the rule, which permits the use of this class of evidence.

There is, however, a more radical objection to the testimony given by these witnesses in rebuttal than has been yet made, though it lies in the general course of former observations. After having shown opportunities for observation of the accused from twice a week to once in two or three months—in one instance at least, being no nearer than six weeks to the date of the homicide, witnesses were asked whether in their opinion the accused knew the difference between right and wrong on August 28, 1891, as to the killing of J. P. Farr. The evidence of these witnesses as to the sane or insane condition of the prisoner was tolerable, only because they testified as to the existence of sanity or insanity as a fact. What deduction was to be drawn from that fact was solely a question for the consideration of, and determination by, the jury. The contest was not as to the fact of the homicide, but was as to the legal responsibility of the accused for its commission. The court properly instructed the jury that if the accused at

35

the time, by reason of insanity, had not the capacity to distinguish between right and wrong, he could not be held accountable. This capacity was the ·sole question for the jury to determine. To allow the witnesses to testify that in their opinion the accused, when he committed the homicide, was sane, and, further, that he knew the difference bebetween right and wrong as to his killing of J. P. Farr, at the time of the commission of that homicide, was to allow of as incompetent evidence as to have permitted the same witnessess to testify whether or not in their opinion the accused was guilty as charged. If the testimony really given was accepted by the jury and acted upon as true, only a verdict of guilty could logically result. The reason for the rule allowing non-expert witnesses to testify as to sanity or insanity as a physical fact has been fully set out, that it may be obvious that in this there is no violation of the general rule which forbids witnesses not experts from testifying as to a mere opinion. In some courts even this class of evidence has been rejected because assumed to be but one kind of an opinion. By the great majority of courts, however, it is allowed because it is not open to that objection. This rule, however, furnishes no excuse for permitting non-expert witnesses giving what without doubt is a mere opinion, and that too upon the one vital question in the case—the legal accountability of the prisoner for a homicide admittedly committed by him.

The judgment of the district court is

REVERSED.

IRVINE, C., concurs.

RAGAN, C., as counsel, having advised parties interested in respect thereto, took no part in the consideration or decision of the above case.