## Mary Lamb et al. v. Lizzie Lynch et al.

Filed September 23, 1898.    No. 8291.

<div style="float:right">56 135<br>56 311</div>

1. **Perpetuities:** Devise to Bishop and Successors. The rule against perpetuities is aimed against undue restraints on alienation. A devise to a named bishop and his successors, without such restraint, does not offend against the rule.

2. **Opinion Evidence:** Insanity. Non-expert witnesses can be permitted to express opinions as to the sanity or insanity of a person only when they have shown other sufficient qualifications, and have stated the facts and circumstances upon which their opinion of mental condition is based.

3. **Testamentary Capacity:** Instructions: Review. The court having of its own motion instructed the jury as to the bearing of the testator's conduct, previously to executing a contested will, on the question of his mental condition at the time of such execution, it was error to refuse an instruction, correct in law and applicable to the evidence, as to the bearing of his subsequent conduct on the same issue.

Error from the district court of Douglas county. Tried below before Keysor, J.  *Reversed.*

*T. J. Mahoney* and *Mahoney & Smyth,* for plaintiffs in error.

*C. A. Baldwin* and *George W. Doane, contra.*

Irvine, C.

James M. Ryan, a priest of the Catholic Church, died in Omaha, March 25, 1894, leaving an instrument, executed in due form, purporting to be his last will and testament. By this there was bequeathed to Father Ryan's sister, Mrs. Mary Lamb, $8,000. The remainder of the estate—quite considerable in value—was bequeathed and devised "to the Rt. Rev. Richard Scannell, Roman Catholic Bishop of the diocese of Omaha, and to his successors in the bishopric of said diocese, to be disposed of or used by said bishop in whatsoever manner said bishop shall deem of greatest advantage to the Roman

Catholic Church in said diocese." The instrument was propounded for probate by Mrs. Lamb, and its probate contested by certain nephews and nieces of Father Ryan, heirs at law and distributees. The grounds of contest were, first, that the will by its terms was invalid; secondly, that at the time it was made Father Ryan was not of sound or disposing mind; thirdly, undue influence. The county court admitted the will to probate. On appeal to the district court there was a verdict for the contestants. The proponent, with whom joins the bishop, brings proceedings in error from the judgment denying probate which resulted from the verdict.

If, as contestants assert, the will is invalid on its face, the judgment must be affirmed without regard to what occurred on the trial. The illegality asserted is that the clause quoted creates a perpetuity. But we cannot read that clause in any manner even implying the slightest restraint on alienation, and it is only an undue restraint on alienation which creates a forbidden perpetuity. The grant to the present bishop and his successors is a limitation of the estate. It does not create estates in remainder to the various successors. Moreover there is an express grant of the power of alienation.

The contention at the trial was, not that Father Ryan was insane in the usual sense, but that when the will was made he was so affected by bodily disease that he was for the time being incapable of exercising that degree of reason which the law in such case demands. Much of the evidence on this issue was in the form of opinions by witnesses not experts. All this testimony was objected to and the rulings admitting it are assigned as error. The character of this evidence and the foundation laid therefor may be illustrated by the testimony of Mrs. Lynch, a niece of the decedent. She testified that she knew Father Ryan; saw him at Mrs. Lamb's house in December, 1891, when he was there sick. He went there December 17. She saw him "mostly every day" the first week of his illness. Saw him December 25 (the day the will was

executed). She that day went to his room and talked to him. He was in bed. Fourteen years before the trial she had kept house for him for a period of about three years. He had often promised he would give witness a house and lot. He had never in fact compensated her for her services. The day after the will was made she called on him. Tears came to his eyes, and he said: "Lizzie, I didn't intend to treat you that way. I didn't know what I was doing." He was in a very bad condition. Solely on this foundation the following question was asked: "From your acquaintance with Father Ryan as you have detailed it to the court and jury, tell the court whether or not on the evening of this 25th day of December, 1891, Father Ryan was in condition to transact ordinary business." She answered in the negative. The conditions under which the opinions of witnesses, not experts, may be received on such an issue, have been several times defined by this court. Such opinions may be received only when they come from persons who have observed the person in question frequently and for a considerable period, and then only after they have narrated the facts on which their opinion is based. (*Schlencker v. State*, 9 Neb. 241; *Shults v. State*, 37 Neb. 481; *Polin v. State*, 14 Neb. 540; *Pfleuger v. State*, 46 Neb. 493; *Hay v. Miller*, 48 Neb. 156; *Hoover v. State*, 48 Neb. 184.) The latter requirement is not merely of proof wherefrom it may appear that the witness had opportunities for observation justifying the formation of some opinion, but it is a requirement that the specific facts leading to the opinion be stated to the jury. The same rule prevails in most of the states, and while the reason therefor does not seem to have been stated in any of our opinions, it may be found from an examination and comparison of decisions elsewhere which this court has expressly followed, or which have been called to its attention in the investigation of the earlier cases. Among such cases are the following: *Clapp v. Fullerton*, 34 N. Y. 190; *State v. Stickley*, 41 Ia. 232; *State v. Klinger*, 46 Mo. 224; *Grant v. Thompson*,

4 Conn. 203; *Shaver v. McCarthy*, 110 Pa. St. 339; *Holcomb v. State*, 41 Tex. 125; *Connecticut Mutual Life Ins. Co. v. Lathrop*, 111 U. S. 612. The witness must detail the facts to the jury, for its information, not to inform the court as to his opportunities to observe; and this to afford the jury means of determining what credit should be given to the opinion. Indeed the facts are the principal thing; the opinion, an incident. The facts being narrated, the witness may then, by such an opinion, say what impression they created on his mind at the time of the occurrence. Thus the jury has the basis for a judgment of its own—the aid of the witness's opinion, and the means of weighing that opinion. It will be seen that the testimony of Mrs. Lynch was wholly wanting in this respect. She showed a long acquaintance and apparently intimate relations with Father Ryan and that she had seen him frequently about the time in question. But details as to his condition, his conduct, his appearance are entirely missing. There is, it is true, a repetition of a short remark the day after that to which the inquiry immediately relates, but this remark throws no light on the issue we are now considering. His language might have been that of a person entirely sane or wholly demented. With the other witnesses the foundation was similar, except that a brief conversation with Father Ryan, immediately after the will was executed, was related. The conversation was not significant of mental condition. If that was all these witnesses observed, and on which they entirely based their opinion, the opinion should have been excluded because not founded on sufficient data. (*Shaver v. McCarthy, supra.*) If other facts were by them observed and used in forming the opinion, they should have been narrated. By this we do not mean that, before the opinion may be received, the witness must, to the remotest minutiæ, detail every fact which has in any degree influenced his judgment. That is impossible. Unremembered trifles of appearance, gesture, accent, may have had an influence on the mind. It is

precisely for the sake of obtaining in brief the resultant of these details, impossible of portrayal, that some courts permit the opinion to be given. But it is necessary that the essentials be narrated and detailed to such an extent that the jury may judge of the correctness of the opinion formed, and, therefore, from those facts itself form a conclusion.

Father Ryan lived more than two years after the will was executed. He recovered his health, at least to the extent that he made a journey to Chicago, and from time to time performed duties appertaining to his priestly office. There was evidence tending to show that after his recovery the lawyer who drew the will and who had retained it after execution, told Father Ryan that he had heard talk of the latter's having made a provision for Mrs. Lamb different from that made in the will, and that he preferred for that reason to place the will in Father Ryan's custody; that Father Ryan kept the will for about a year and then gave it into the custody of Mrs. Lamb. The proponent requested the following instruction: "It will be your duty to inquire and determine from all the evidence in the case what the mental condition of the deceased was at the time of making the will in question, as his mental condition at that time will have to control as to whether he was of sound mind in making the will, and in this connection if you find from the evidence that he had the will in his custody and possession for a long period of time between the date of its execution and the time of his death, that during said time he was in the full possession of his mental faculties and uninfluenced by any coercion or undue influence and delivered said will to the witness Anna Lamb with instructions for its safe-keeping, you will take that fact into account as a circumstance bearing upon the question of his mental condition at the time the will was executed." This was refused. There was also testimony tending to show that Father Ryan had previously expressed an intention to provide for other relatives and declared he would give

nothing to the church. The court of its own motion instructed as follows: "If you believe from the evidence that said testator before executing said instrument had expressed any fixed purpose and intention regarding the disposition of his property at variance with the provisions of his said will, then you may consider whether or not the provisions thereof are consistent with mental soundness and with his previously expressed and fixed purpose, if any; and if you find they are so, then those facts also may be weighed by you in determining the question of mental soundness of said testator at the time of the execution of the written instrument under consideration." It is not always error to refuse an instruction correct in the abstract and applicable to the evidence, asked for the purpose of explaining the bearing of particular evidence singled out from the mass; but here we think the former instruction should have been given. It was applicable to the proof, stated the rule correctly, and related to evidence the pertinency of which might not be realized or properly understood in the absence of an instruction. The court had of its own motion instructed in a similar manner as to the pertinency of Father Ryan's past conduct, and justice demanded that on proper request it should also instruct as to the pertinency of his subsequent conduct.

<div align="right">REVERSED AND REMANDED.</div>