IN RE ESTATE OF ELLEN WILSON.

CARRIE MOLLERING, APPELLANT, V. JAMES KINNEBURG ET AL., APPELLEES.

FILED APRIL 18, 1907.   No. 14,723.

1. **Trial: INSTRUCTIONS: HARMLESS ERROR.** The court, at the request of the proponent, gave several instructions relating to the mental qualifications of the testatrix, each of which omitted one or more of the elements generally recognized as necessary to testamentary capacity. The omitted elements were clearly and plainly stated in an instruction given by the court on its own motion. *Held*, That any error arising from giving the instructions asked by the proponent was rendered harmless by the instructions of the court.

2. **Wills: PROBATE: INSTRUCTIONS.** Instructions requested by the contestant in an action to probate a will examined, and the action of the court in refusing the same upheld.

3. **Evidence: TESTAMENTARY CAPACITY.** One who shows an intimate acquaintance with a person whose mental capacity is in question, and who is familiar with his general conduct, who had occasion to and did observe the party and his condition at the time when his state of mind is in dispute, may testify affirmatively that in his opinion such person was of sound mind and possessed of his normal faculties, while the opinion that such person was of unsound mind must be based on facts consisting of particular acts or conduct indicating unsoundness.

APPEAL from the district court for Johnson county: WILLIAM H. KELLIGAR, JUDGE. *Affirmed.*

*Billingsley & Greene, Philip F. Greene* and *L. C. Chapman,* for appellant.

*S. P. Davidson* and *J. C. Moore, contra.*

DUFFIE, C.

Some 30 years ago John Wilson, Jr., a son of John and Ellen Wilson of Tecumseh, Nebraska, left the home of his parents on account of some misunderstanding between them. Since then, as we understand, no communication has taken place between himself and his family, and it is not known whether he is now living or dead. In 1903 John Wilson and his wife, Ellen, then nearly 80 years of age, made a trip to Dawson City, Alaska, for the purpose of finding their son. Prior to their departure they executed a joint will, by the terms of which Carrie Mollering, their granddaughter and appellant herein, James Kinneburg, their nephew, and Susan K. Sullivan, an intimate friend, were bequeathed $1,000 each. An annuity of $200 was provided for Margaret Kinneburg, a sister of Mrs. Wilson, $300 was set apart to be placed at interest for keeping the family burial ground in good condition, and the residue of the estate, consisting of about $20,000, was to be kept at interest for ten years for John Wilson, Jr., or his heirs, and, in the event of their failure to appear within that time, the executor was to convert the property into money, and, after paying himself "all the law allows in the most liberal terms," to divide it, share and share alike, between Carrie Mollering, James Kinneburg, Susan K. Sullivan, Duncan Kinneburg and Donald Black, a nephew of Mrs Wilson. The search for the lost son proved unavailing, and the parents returned home, where John Wilson, the father, died February 26, 1905. Ellen Wilson, his wife, lived at her home in Tecumseh until her death on July 22, 1905. On July 13, 1905, she suffered a stroke of paralysis, and on the evening of that day she executed the will in controversy in this case. The facts concerning the making of the will are these: The then county judge was in possession of the joint will made by the husband and wife before starting on their trip to Alaska. Mrs. Wilson sent for him to draw her will, but on account of his official position he refused to act in the matter, and she then re-

quested him to send for J. C. Moore, who drafted and was present at the execution of the will. Mrs. Wilson could not write, and her name was attached to the will by Moore at her express request, and she, with her own hand, attested it by her mark. Moore had received from the county judge the joint will, which Mrs. Wilson wished followed, except in some details which she imparted to Mr. Moore. The will bequeaths to Margaret Kinneburg $12 a month during her life; to Carrie Mollering $1,000, and no more; to James Kinneburg $1,000 and all notes held by the testatrix against him for incidental debts; to Susan K. Sullivan $500, and no more; $300 was to be placed at interest for the purpose of keeping the family grave lots in good condition. The residue of her property was to be kept at interest for five years from the date of her death, at the end of which time, if her son John Wilson, Jr., or his heirs, did not appear, the executor was directed to sell and convey all her property, and, after paying himself "all the law allows in the most liberal terms," the residue thereof was to be divided, share and share alike, between James Kinneburg, Duncan Kinneburg and Donald Black, her nephews. The words "and no more" were inserted in the will after each specific bequest whereever they occurred at her express request and direction, given while the will was being read to her, article by article, previous to its execution. The probate of this will was resisted in county court by the appellant upon the grounds of mental incapacity of the testatrix and undue influence exercised over her by James Kinneburg. The county court, after a full hearing, entered an order admitting the will to probate, and, upon appeal to the district court by the contestant, the jury found in favor of the proponent, and the contestant has appealed from a judgment entered on the verdict.

The four errors first assigned relate to instructions 1, 2, 4 and 6, given by the court on request of the proponent. The objections urged against these instructions are that they failed to inform the jury that it was necessary for the

testatrix to understand the nature of the act she was performing in making the will, to know and retain in mind the amount and character of her property, and who were or naturally should be the objects of her bounty, and to have a full understanding as to who and the purposes for which her bequests were made. It is true that these instructions were faulty in the respect named, but the court, in its seventh instruction, fully covered the subject, and informed the jury in explicit terms that, "if Mrs. Wilson had sufficient mental capacity to know what property she possessed, where it was, and know its value, and know and understand her obligations to her relatives, and know what she wished to do with the property, and could keep these several matters in her mind until a will was prepared to carry into effect her intended disposition of her property, then she was competent to make a will."

Exception was also taken to the refusal of the court to give the fifth instruction requested by the contestant, to the effect that, if the will in this case makes no devise or bequest of the property to the son of the testatrix, and if you believe from the evidence that it was the intention of the testatrix to will all, or a portion, of her property to her son, your verdict should be for the contestant." If we understand the position of the appellant it is this: The testatrix, by providing that the residue of her estate, after the specific bequests had been paid to the legatees, should remain at interest for five years to await the return of her son or his heirs, intended to make some provision for them in case of their return, and that, because the will did not in terms provide for the disposition of the residue in case her son or the heirs did return within the five years, it fails to fully express her intentions. It will be noticed, however, that by the terms of the will the residuary bequests are made conditional. They are to go to the residuary legatees only on condition that the lost son or his heirs do not return to Tecumseh within five years. In case of their return within the time limited, the residuary bequests become inoperative and the

son or his heirs will receive their full share of the estate under the terms of the will.

The sixth instruction requested by the contestant is to the effect that, if the jury find that the will does not make provision for Carrie Mollering or for any other person that was intended by the testatrix, they should find for the contestant. This instruction was properly refused, as the will does make provision for Carrie Mollering, and a careful examination of the evidence does not disclose a failure on the part of the testatrix to provide for any party whom the testatrix had in mind or whom she wished to share in her estate. The seventh instruction, requested by the contestant and refused, is open to the same objection, there being nothing in the testimony to indicate that the testatrix had not made provision for every one whom she wished benefited.

The court admitted evidence of old friends and acquaintances of the testatrix to the effect that at the time of making the will she was in her normal condition, in full possession of her faculties, and had mental capacity sufficient to understand and transact her business. Objection to this testimony is made on the ground that no sufficient foundation was laid, in that no facts were related by the witnesses upon which their opinions were based. The rule is well established that where nonexperts are called to establish the insanity or want of mental capacity of a party, the facts upon which they base their opinions must be first stated, in order that the court and jury may determine whether, from the facts given by the witness as the basis of his opinion, it is well founded. When the witness is called to establish a normal condition of the mind and mental capacity to transact business, the rule supported by the greater number of authorities is that those well acquainted with the party whose mental capacity is the subject of inquiry may testify affirmatively that in his opinion such person was of sound mind. The supreme court of Iowa, speaking of the question, uses the following language: "There seems to be no controversy

about the general rule that one who shows an acquaintance with the person whose mental capacity is in question and is familiar with his general conduct may testify affirmatively that in his opinion such person was of sound mind, while the opinion that such person was of unsound mind must be based on facts consisting of particular acts or conduct indicating unsoundness." *Hull v. Hull,* 117 Ia. 738. The following authorities are all to the same effect: *Lamb v. Lippincott,* 115 Mich. 611; *People v. Borgetto,* 99 Mich. 336; 2 Jones, Evidence, sec. 366.

Appellant insists that this court, by its former holdings, is committed to the rule that a nonexpert witness will not be allowed to give an opinion on the sanity or insanity of a party, without first laying the foundation for such opinion by stating the particular facts and circumstances upon which it is based, and it is contended that an intimate acquaintance, extending over a long period of time, with opportunities to observe his conduct, is not a sufficient qualification upon which to base an opinion of the party's sanity. There may be some misunderstanding by the profession concerning the rule applicable to the qualification of a nonexpert witness to give an opinion relating to the sanity or insanity of a party whose mental condition is a subject of inquiry; but an examination of the cases will, we think, show little disagreement as to the true rule, and the one which this court has almost universally followed. The question was first before the court in *Schlencker v. State,* 9 Neb. 241. In that case the defense was insanity, and the state called several nonexpert witnesses to controvert the testimony offered by the defense. In the opinion it is said: "The opinions of these witnesses as to the prisoner's mental condition, based upon what they had personally observed, and then detailed to the jury, were admitted in evidence under the objection that they were incompetent evidence." It will be observed that the state laid the foundation for the introduction of the opinion of these witnesses. What facts constituted that foundation is not disclosed in the opinion, and the question

of whether a long and intimate acquaintance with a party whose mental capacity is in question, with opportunities to observe his acts from time to time, is a sufficient foundation was not apparently in question and not determined, and the case is, therefore, of little weight as an authority on the question which we are now considering. In *Snider v. State*, 56 Neb. 309, it appears that the rule contended for by appellant was applied to witnesses called to prove the insanity of a party. This is quite apparent from the language of the court, as follows: "Counsel were endeavoring to elicit from them (the witnesses) facts throwing light on the question of defendant's sanity. The answers stricken out were in the nature of opinions or inferences from observed facts not previously narrated; for instance, 'he appeared not to understand things.' In each instance the court struck out such answers, but permitted further questions to be asked calling out the facts which gave rise to such opinions, and finally, after the facts were so narrated, permitted answers to categorical questions eliciting the opinion of witnesses, derived from those facts, as to defendant's sanity." As this case deals only with witnesses called to prove insanity it does not enlighten us on the question we are dealing with. *Lamb v. Lynch*, 56 Neb. 135, *Hay v. Miller*, 48 Neb. 156, and *Hoover v. State*, 48 Neb. 185, are cases of the same character, and the question of the qualification of a nonexpert witness to prove soundness of mind was not discussed. In *Shults v. State*, 37 Neb. 481, the trial court allowed the opinion of nonexpert witnesses to be given on the question of whether the person knew the difference between right and wrong of an act at that time committed by him, and the case was reversed, the opinion holding that the court erred in allowing the question to be answered. This holding was, however, overruled in *Pflueger v. State*, 46 Neb. 493, Judge Post reviewing that case in the following language: "In that case nonexpert witnesses were by the district court permitted to testify that the prisoner did in fact know the difference between right and wrong at the time

of the homicide charged, and on review upon petition in error to this court it was held that for obvious reasons the testimony should have been confined to the opinions of the witnesses, leaving the jurors to draw their own inferences therefrom. The killing being conceded, the vital question is whether the accused is accountable for his act, and which depends for its solution upon whether he was, or was not, at the time he took the life of the deceased, able to distinguish between right and wrong with respect to the particular act involved. Tested by that rule it would seem that the evidence complained of was rightfully admitted. * * * *Shults v. State,* so far as it asserts a different view, is modified to conform to the rule asserted by the authorities above cited."

In *Pflueger v. State, supra,* the rule is distinctly announced that "the opinions of nonexpert witnesses who have known the accused for fifteen years and who met and observed him almost daily for six weeks or more immediately preceding the commission by him of a homicide, their attention being particularly directed to his mental condition, are admissible as bearing upon the question of his sanity." This seems to us to be the common sense view. Sanity is the rule and insanity the exception. What acts or circumstances are there that an acquaintance can relate as a foundation for his opinion that a party is of sound mind, except that he has known him for years, has had a close personal acquaintance, and has never observed anything in his speech or conduct denoting insanity or mental incapacity? On the other hand, the insanity or mental incapacity of a party is indicated by many acts and circumstances which are observed and which can be narrated by those whose opinions are desired, and it is those acts and circumstances alone upon which the nonexpert must rely for his opinion. We believe, therefore that the true rule, and the one which this court has approved in *Pflueger v. State, supra,* and which it has never disapproved, so far as our examination has gone, is that it is a sufficient qualification for a nonexpert

witness called to testify to the sanity and mental capacity of a party to show an intimate personal acquaintance with him, and opportunities and occasions to observe his actions and demeanor in relation to his sanity at the time it is called in question.

We have carefully gone through the whole record and examined the evidence with more than ordinary care. While it is true that the testatrix suffered from a slight stroke of paralysis shortly before the execution of the will, the physicians in charge, and her neighbors and acquaintances, are emphatic in their testimony that at the time the will was executed she had recovered so as to be fully conscious and capable of transacting business with a full understanding of its import. It is true that her speech was not as distinct as prior to the stroke, but her mind was clear, and, when the will was read to her, article by article, by the draftsman, she made corrections and directed alterations in several respects. When the paragraph bequeathing $1,000 to Carrie Mollering was read, she directed that the words "and no more" should be added, as she did also to some other of her bequests. There is evidence strongly tending to show that she was not possessed of the most friendly feeling toward the contestant; that she had expressed herself to one or more of her neighbors to the effect that, when Mrs. Mollering was living with her and had been offered a daughter's place in the home and all a daughter's part, she had not been grateful. We are convinced from the testimony that she fully understood the terms of her will, that she understood her obligations to her relatives, and knew the value of her property and how she wished to dispose of it. The county court, after a full hearing, took the same view, and this is reinforced by the verdict of a jury, which received the approval of the judge of the district court who saw and heard the witnesses. Under these circumstances, it would be a gross wrong to set aside the will of a party to whom the law awards the right to dispose of her property in any manner that she sees fit, and under the circumstances tech-

nical errors or objections not going to the merits of the case should not stand in the way of carrying out the solemnly expressed wish of the deceased person.

We recommend an affirmance of the judgment.

ALBERT and JACKSON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment appealed from is

AFFIRMED.