OLAF ISAAC ET AL., APPELLANTS, V. W. J. HALDERMAN ET AL., APPELLEES.

FILED JUNE 8, 1906. No. 14,365.

1. **Wills:** SIGNATURE. A testator, being unable to write his own name, said to the draftsman of his will, in the presence of two witnesses: "You know I cannot write. You will have to sign it for me." *Held*, That this was a sufficient request to authorize the draftsman to sign the testator's name.

2. **Nonexpert** witnesses called upon the question of the mental capacity of a testator must state the facts upon which their opinion of incapacity is based.

3. **Evidence** examined, and *held* insufficient to show either mental incapacity or undue influence.

APPEAL from the district court for Pawnee county: ALBERT H. BABCOCK, JUDGE. *Affirmed.*

*W. H. Richards* and *L. W. Colby*, for appellants.

*G. T. Belding, J. C. Dort* and *F. Martin*, contra.

DUFFIE, C.

In 1867 Nels Isaac and his two brothers came to Nebraska, and eac.i took up a homestead in Pawnee county in the same neighborhood. Nels Isaac and his brother Fred were bachelors. Some years later Fred Isaac died from injuries received in an accident, and Nels purchased from the administrator of his estate the 160 acres of land of which he died seized. Nels resided on his own homestead until a short time previous to his death, living alone and usually renting his two farms. About ten years previous to his death, which occurred August 9, 1902, Frederick Southard rented from him the place formerly belonging to his deceased brother, and continued as his renter up to the time of his death. The evidence is quite conclusive that Nels was a strong, hearty man up to a date not longer than one year previous to his decease; that something like two weeks previous to his death he left his own house and went to live with his renter, Frederick Southard, at whose place he died from inflammation of the bladder. On July 30, 1902, he executed his last will and testament, by the terms of which he devised to his renter, Frederick Southard, and Alvaretta Southard, his wife, the 160 acres of land upon which they were living as his tenants. To his brother, Swen A. Isaac, he bequeathed $10. The balance of his estate he bequeathed to his other brothers and sisters who were then living, and to the legal heirs of his brothers and sisters who were dead. He named W. J. Halderman as executor of this will. The will was admitted to probate, but before the estate was finally settled the contestants moved to have the probate thereof set aside, and to be allowed to offer objections, which was done. Upon a trial in the county court the will was again admitted to probate, and from this order of the county court an appeal was taken by the contestants to the district court.

The objections made to the probate of the will are (1) That the instrument is not executed as required by law; (2) that it is not properly attested; (3) that at the date

of its execution Nels Isaac was not possessed of sufficient mental capacity to make a will; (4) that the will was executed in its present form by reason of the undue influence exerted upon the testator by Frederick and Alvaretta Southard. The jury returned a verdict finding that the testator was of sound mind and memory, and not under any restraint or undue influence when the same was executed. The following special interrogatories and answers were also returned by the jury: "(1) Was the instrument 'Exhibit A' signed by Nels Isaac, or was it signed by some other person in his presence and by his express direction? A. Yes. (2) At the time of the alleged execution of 'Exhibit A' was Nels Isaac of sound mind and memory? A. Yes. (3) Was the execution of the instrument 'Exhibit A' obtained by the undue influence of Frederick and Alvaretta Southard? A. No." From the order entered on this verdict admitting the will to probate, and directing a distribution of the estate in accordance with its terms, the contestants have appealed.

The evidence discloses that Nels Isaac, the testator, could not read, and it is earnestly insisted that the evidence fails to show that his name was signed to the will by his express direction as required by our statute. The testimony relating to the execution of the will may be briefly summarized as follows: On the day previous to the making of the will the decedent asked Dr. Plehn, who attended him in his last illness, to call on W. J. Halderman, a banker of the town of Burchard, and with whom the decedent had transacted his banking business for many years, and request him to come to the house and write his will and to bring witnesses. On the next evening Mr. Halderman, together with his son, Fulton Halderman and Dr. Plehn, drove out to the decedent's farm occupied by Southard, and found the decedent sitting or lying in a hammock in the yard. The elder Halderman and decedent went into the house and into the room occupied by Isaac, where the will was written. Halderman testified that Isaac would dictate to him a section of the will, which

would then be read over to him, after which another section of the will would be dictated, written and read to Isaac, and that after it was completed the whole instrument was read to Isaac who manifested his assent thereto. The decedent himself then opened the door into the kitchen where the doctor and young Halderman were sitting, and asked them to come in and witness his will. The younger Halderman started to read the instrument, when his father said it was unnecessary as Mr. Isaac was fully acquainted with its provisions, and turned to Isaac and told him that it was ready for his signature. Isaac then said to him: "You know I cannot write. You will have to sign it for me," and thereupon the elder Halderman signed Isaac's name to the instrument and afterwards made his mark, Isaac placing his hand upon the top of the pen. Dr. Plehn and young Halderman then signed as witnesses. This is the testimony of the two Haldermans and Dr. Plehn, and is uncontradicted. In *Murry v. Hennessey*, 48 Neb. 608, it was held that, where a will was signed by a third party and no proof offered of any request so to do from the testatrix, valid execution of the will was not established. But in *Elliott v. Elliott*, 3 Neb. (Unof.) 832, the testator said to Mr. Peterson that the latter would have to write his name, and that he did so, and the testator after that touched the pen while his mark was made. This was held a sufficient request upon the part of the testator that his name be signed by Peterson. The case is a direct authority in support of the finding in this case that the will was properly executed.

We have read with care the voluminous record containing the evidence in this case, and can find no testimony which would go to support a verdict, if such had been returned, that the testator was of unsound mind or not perfectly capable of transacting business at the time the will was made. He had lived in Pawnee county since 1867. He had accumulated property estimated to be worth about $20,000 at the time of his death. His mental capacity and good business judgment had not been questioned up to

the time this contest was filed.  The doctor who attended
him in his last illness, and another physician called in for
consultation a few days previous to his death, both affirm
his mental capacity.  The banker with whom he transacted
his business for years had no doubt of his ability to
thoroughly understand and appreciate what he was doing.
Numerous neighbors and acquaintances with no interest
in the case testified to his capacity.  On the other hand two
or three physicians having no personal acquaintance with
him, and in answer to hypothetical questions based upon
his mode of living, of a secret habit which he is said to have
practiced, and the fact that he usually kept a supply of
beer on hand and of which he drank about one bottle a day,
gave their opinion that he was not of sufficient mental
capacity to make a will or to transact business.  He never
used intoxicants to excess.  Being a bachelor, and living
by himself, his house was not in the best of order nor tidily
kept, and while some parties, apparently disinterested, tes-
tified to his want of mental capacity, the facts upon which
they based their opinion are either not shown in the record
or are clearly insufficient to sustain a finding of mental
incapacity.  We doubt whether we should pay any atten-
tion to the evidence of most of contestants' witnesses.  In
numerous cases we have held that a nonexpert witness can
be permitted to express his opinion as to the sanity or
insanity of a person only when he has shown other suffi-
cient qualifications and has stated the facts and circum-
stances upon which his opinion of such mental condition is
based.  *Hoover v. State,* 48 Neb. 184; *Snider v. State,* 56
Neb. 309; *Lamb v. Lynch,* 56 Neb. 135, and cases found in
1 Page, Digest, 835.  As said by the supreme court of
Michigan in *Hibbard v. Baker,* 141 Mich. 124:

"It may be a question of some difficulty to determine in
all cases whether a witness has shown himself competent,
nor do we intimate that he may not be able to state to
the jury his opinion, after showing that there were acts
and appearances of the party which he is unable to
describe to the jury, but which left an impression upon

his mind; but in the absence of this, and where the testimony of the witness only goes the length of showing acts which are entirely consistent with sanity, and which have not the slightest tendency to show insanity, it would be a dangerous rule which would permit his opinion to be received." The reason for this is well stated by the same court in *Beaubien v. Cicotte*, 12 Mich. 459:

"The general doctrine is, that all witnesses speaking from observation must, as far as possible, state such facts as they can give as the basis of their opinion. This rule does not require them to describe what is not susceptible of description, nor to narrate facts enough to enable a jury to form an opinion from those alone. This would be impossible; and if it could be done, there would be no occasion for any opinion from the witness. * * * But, if witnesses were not compellable to state such facts as are tangible, there would be no means of testing their truthfulness. When they state visible and intelligible appearances and acts, others who had the same means of observation may contradict them, or show significant and explanatory facts in addition; and if their story is fabricated, or if they describe facts having a medical explanation, medical experts may detect falsehood in inconsistent symptoms, or determine how far the symptoms truly given have a scientific bearing."

We fail to discover any evidence of undue influence exerted upon the testator by Frederick Southard or his wife. It is true they resided on the testator's farm for ten years or more, and had the opportunity to approach and influence him, but opportunity alone is not sufficient. It is quite evident that the deceased was well pleased with Southard's management of his farm and that he took a great liking to Southard's children, a young boy and girl. The children apparently reciprocated this kindly feeling and were in the decedent's company a great deal. He often took them to town and expressed great love for them, and on several occasions had said that he would will them the farm upon which their father and mother resided. It

appears, however, that about the middle of July previous to his death he changed his mind and concluded to give the land upon which plaintiff lived to Southard and his wife rather than to the children.. J. S. Harrod testified that on July 18, 1902, Isaac brought a load of oats to town; that he shoveled out a part of the load, when Harrod took the shovel and unloaded the balance. After some conversation about other parties Isaac said to the witness: " 'Do you remember what I told you down town about the children?' I said, 'Fred Southard's?' And he said, 'Yes.' Well, he said, 'I have changed my mind about that. Sometimes, when a boy get 19 or 20 years old, they get kinda smart with older heads to nag them on, and Frank might tell his father and mother, when he was 19 or 20 years old, to get off there, that he owned the property.' He said, 'I would hate to have that happen, when I kicked the bucket. When I am gone, I wouldn't want that to happen. Fred Southard and his wife has been the best friends I ever had. They have treated me better than my own relations,' and he said, 'I am going to give the property to Fred and his wife, and let the children have it after they get through with it.' " Southard nor his wife were present when the will was made.. It does not appear that they had knowledge of his intention to make a will at the time. So far as the record discloses, there is absolutely no evidence of any influence brought by them to bear upon the testator relating to the disposition of his property. .It is further evident that the testator was not on the best of terms with some of his own relatives. His brother Swen, who lived in the same neighborhood, rarely called on him, and for years they did not visit back or forth to exceed half a dozen times. The evidence indicates that some trouble arose out of the settlement of the estate of the deceased brother, and this may, and probably does, account for the small amount bequeathed to him. The fact that the decedent bequeathed a large part of his property to strangers in blood is not an evidence either of mental incapacity or undue influence. Courts and juries are not warranted in setting aside last wills and

testaments, and substituting in lieu thereof their own notions as to what a testator should do with his property, except upon satisfactory evidence. No right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of that right. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. The law wisely secures equality of distribution where a man dies intestate, but the very object of a will is to produce inequality and to provide for the wants of the testator's family, to protect those who are helpless, to reward those who have been affectionate, and to punish those who have been disobedient. In this country a man's prejudices form a part of his liberty. He has a right to them. He may be unjust to his children or relatives. He is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law. Where a man has sufficient memory and understanding to make a will, and such instrument is not the result of undue influence, it is not to be set aside without sufficient evidence, nor upon sentimental notions of equality. The verdict being the only one which the evidence warrants, errors in the instructions, if any, are immaterial and need no consideration.

We recommend an affirmance of the judgment.

ALBERT and JACKSON, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.