CECELIA CARTER, APPELLANT, v. WILLIAM GAHAGAN ET AL., APPELLEES.

FILED APRIL 12, 1918. No. 19860.

1. Wills: COMPETENCY. A testatrix who knows and understands the nature of the act she is performing, and the amount and character of her property and the disposition she wants to make of it, and also knows her kindred whose relationship to her would nat-

urally make them the object of her consideration, is of disposing mind and memory and is competent to make a will.

2. **Evidence:** MENTAL CAPACITY: NONEXPERTS. Where a nonexpert witness testifies to the unsoundness of mind of a testatrix, he must relate the particular acts and conduct of such testatrix upon which his conclusion is based.

3. **Wills:** MENTAL CAPACITY: EVIDENCE. The record examined, and *held* that it was error to admit in evidence the guardianship proceedings that are discussed in the opinion on the question of mental capacity of the testatrix.

APPEAL from the district court for Douglas county: LEE S. ESTELLE, JUDGE. *Reversed.*

*Matthew Gering* and *P. A. Wells,* for appellant.

*Arthur F. Mullen* and *James A. Donohoe, contra.*

DEAN J.

Bridget Gahagan died in Douglas county on November 6, 1914. Her will was probated there in county court, and on appeal and trial to a jury the judgment of the county court was reversed. The proponent, Cecelia Carter, who is a daughter of decedent, has appealed.

Patrick Gahagan and Bridget, his wife, were pioneer settlers in Holt county. He died there in 1907. In October, 1909, Mrs. Gahagan moved to Omaha, where she lived with Cecelia until she died. She executed the will in Douglas county on February 19, 1910, and named Cecelia as sole beneficiary and executrix. There are ten children, but the residence of four of them has long been unknown. Five have joined in this suit as contestants. The estate consists of about $5,000, all but about $200 of this being the proceeds of the sale of 160 acres of land in Holt county that was given to decedent by her son Stephen in 1892, and on which she resided for many years. He is one of the children who disappeared. Contestants argue that by undue influence Mrs. Carter induced her mother to execute the will, and that she was mentally incompetent to make a will.

On January 28, 1910, Mrs. Gahagan sold her land for $4,800 through an O'Neill real estate agency to her son William, who resided in Holt county. The money was deposited in an Omaha bank, and within a few days Mrs. Maggie Fluckey, a daughter of Mrs. Gahagan, began two actions in Douglas county, namely, one in the district court to restrain her mother and Cecelia from withdrawing the money from the bank, and one to have a guardian appointed for her mother, alleging mental incompetency. About a week afterwards William came from O'Neill to Omaha, bringing with him Mr. P. J. McManus and Andrew Smith, residents of Holt county, for the purpose, as he testified, of inducing his mother to return with them to O'Neill to have a guardian appointed for her there. After some talk among the children and their mother, and the two friends, Mrs. Gahagan agreed that she would go to O'Neill and have a guardian appointed there, provided Mrs. Fluckey and those associated with her would dismiss the two suits then pending against her in Douglas county. Under the terms of this agreement the suits were dismissed, and William and his two friends at once returned to O'Neill, taking Mrs. Gahagan with them. On March 12, 1910, on William's application Mr. McManus was there appointed guardian of his mother. Cecelia followed the party to O'Neill a few days before the appointment was made on receipt of word from her mother that her presence was desired there.

In the district court the jury found specially that Mrs. Gahagan was a resident of Douglas county when the guardian was appointed in Holt county. Contestants concede that the effect of the jury's findings "made the so-called guardian proceedings in Holt county a nullity." But the record of the guardianship proceedings is in evidence, and proponent argues that the court erred in admitting it over her objection, and insists that the jury were thereby prejudiced against her. She contends that the record was misleading. The evidence shows that the facts and circumstances sur-

rounding the appointment of a guardian for Mrs. Gaha-
gan afford no reasonable ground for inferring an ad-
mission upon her part that she was in need of a
guardian to manage her business. We conclude the record
ord should have been excluded. *Mulholland's Estate*,
217 Pa. St. 65; *Jenckes v. Court of Probate of Smith-
field*, 2 R. I. 255; *Dewey v. Allgire*, 37 Neb. 6.

In a record of unusual length we are unable to dis-
cover testimony that will support contestants' argument
that Mrs. Gahagan was unduly influenced to make the
will or that she was mentally incompetent. The verdict
does not seem to be supported by the evidence. Our
conclusion is based on the following among other facts
appearing in the record. Mrs. Gahagan for more than
30 years before her death seems to have been compe-
tent to take care of her business affairs. She was care-
ful about her expenditures. About two years before
her death she deplored the fact that some of her chil-
dren began the two Douglas county suits against her,
and said it showed, as she expressed it, "a good deal of
nerve" for them to do that and then compel her to pay
the expenses. There was no trouble in the Gahagan fam-
ily until the land was sold. She wanted to sell it because,
as she said, the rentals were only about $200 a year,
and she could realize more if the land were sold and
the money put out at interest. In October, 1909, just
before she came to Omaha the last time, there to live
with Cecelia, she had been boarding in Holt county
with an old lady who was not related to her. When
she accompanied William and his party to O'Neill to
have the guardian appointed she went to a hotel, and
there too she stayed among strangers for two weeks
or more, and was apparently always capable of taking
care of herself. Her son William, who lived less than
10 miles away, called on her at the hotel only three
times during this period. A witness for contestants
was a guest for a week at the hotel while she was there
and talked with her frequently. Her conversation as

related by him does not disclose mental weakness. Mr. McManus testified that she was gratified upon inquiry to know that the principal sum of her money was not being depleted, and that the interest was supporting her. Contestants' witnesses, who were nonexperts, testified to conclusions respecting Mrs. Gahagan's lack of mentality. Their testimony does not seem to be based on particular acts or conduct indicating unsoundness of mind, but was mainly to the effect that she could neither read nor write nor make change, and that she was at times forgetful.

William testified that his mother was of unsound mind, but admitted that she executed a deed to the land that he bought only three weeks before the will was signed. The contract was signed by her in 1908 under which the land was sold in 1910. He also testified that, up to the time the will was executed, his mother rented the land and collected the rent, and also that the drafts that were sent to his mother in payment for the land were mostly, if not all payable to her order. William Gahagan's wife testified that Mrs. Gahagan had asthma, coughed a good deal, had Bright's disease, that she moved around slowly, sat or lay down most of the time, could not talk very long, and that she was forgetful and would repeat herself frequently, and could not count money. To substantially the same effect was the testimony of Mrs. Maggie Fluckey and her husband.

Two physicians were called by proponent who had attended Mrs. Gahagan. One of these testified that he saw her every day for two weeks in December, 1910, and that he treated her for asthma and coughing spells. He said her replies were intelligent, and that there was nothing about her ailment that would affect mentality. He noticed nothing unusual in her manner, and said that her condition was such as is common to a woman of her age. The other physician testified that he knew Mrs. Gahagan in Holt county from his boyhood until 1898, and that he had a passing acquaintance with her until her death. He treated her for about a week in her

last illness for asthma and coughing spells that brought on heart complications that resulted in death. He said her answers to his questions were normal, and that there was nothing to indicate that her mental condition was unsound. As a boy and young man in Holt county he did not recall anything out of the ordinary in her mental condition.

A witness called by proponent testified that for the last two years of Mrs. Gahagan's life she lived only three doors from her, and she saw her not less than three times a week during that period, and that she often saw her at the store buying groceries and paying for them, making change, and the like, and that once or more she saw her pay the rent and pay for coal, taking receipts for the payments. It is not shown that Mrs. Gahagan's mentality was any different in the last two years of her life than it had been for some years preceding that period. To the same substantial effect is the testimony of two or more other witnesses called on the part of the proponent who had known Mrs. Gahagan during the entire period of her residence in Omaha. Contestants argue that they, and not Cecelia, helped make their mother's estate. But credit for the enhanced value of the land, practically her sole estate, that was given to Mrs. Gahagan by her son in 1892 cannot be claimed by any of the children.

The execution of the will appears to have been in all respects regular. There is no attempt to conceal the fact that Cecelia went with her mother to the office of the lawyer who wrote it, and that she was present when it was signed. It is shown that Cecelia remained in an outer office while her mother told counsel the disposition that she wanted to make of her property, and that a stenographer was called in, and in Mrs. Gahagan's presence and hearing the will was dictated and signed by Mrs. Gahagan by her mark and by competent witnesses. The stenographer testified that Cecelia accompanied her from the outer office into the room where the will was dictated, and after the will was prepared

she was present when it was read to Mrs. Gahagan, but that Cecelia, as nearly as she could recall, took no part in the talk respecting the will while she was in the office with her mother. It is shown that Mrs. Gahagan from time to time told some of her friends that she had written a will giving to Cecelia all of her property because her daughter had always been good to her and took care of her when she was ill and needed care. *Isaac v. Halderman*, 76 Neb. 823; *In re Estate of Wilson*, 78 Neb. 758; *Lamb v. Lynch*, 56 Neb. 135.

It sufficiently appears that the testatrix, though advanced in years and subject to the usual infirmities of age, was nevertheless capable of attending to business affairs. It also appears that she knew and understood the nature of the will she signed, and the amount of her property and its character, and those who were, or should be, the objects of her bounty. The judgment does not seem to be supported by the testimony.

The judgment is reversed and the cause remanded.

REVERSED.

MORRISSEY, C. J., and ROSE, J., not sitting.