IN RE ESTATE OF VACLAV J. KUBAT.
JOSEPH L. KUBAT ET AL., APPELLANTS, V. CHARLES H. KUBAT ET AL., APPELLEES.

FILED FEBRUARY 15, 1923. No. 22226.

1. Wills: CONTEST: QUESTIONS FOR JURY. In an action contesting the validity of a will for want of mental capacity in the testator, and undue influence exerted upon him, if the evidence on these issues is conflicting, they should be submitted to the jury for determination.

2. ———: MENTAL CAPACITY. "If a testator knows the extent and character of his property, the natural objects of his bounty, and the purposes of his devises and bequests, he is mentally competent to make a will." *In re Estate of Laflin*, 108 Neb. 298.

3. Evidence examined, and *held* sufficient to sustain the verdict and special findings of the jury.

APPEAL from the district court for Douglas county: WILLIAM A. REDICK, JUDGE. *Affirmed.*

*Murphy & Winters*, for appellants.

*Baker & Ready*, contra.

Heard before MORRISSEY, C. J., ROSE, ALDRICH and DAY, JJ., TROUP, District Judge.

ALDRICH, J.

This is an appeal from the judgment of the district court for Douglas county denying the probate of the will of Vaclav J. Kubat, deceased, whose will was contested

by Charles H. Kubat and Mary Lenicek, son and daughter of the deceased, on the ground that the testator was, at the time of the making of the will, of unsound mind, and that the proposed will was obtained through undue influence. The case was tried before a jury, who by their verdict found for the contestants generally, and further that the document offered in evidence was not the last will and testament of Vaclav J. Kubat, deceased. In addition to the instructions, the court submitted two special interrogatories, which with the answers of the jury follow:

"First: Was Vaclav J. Kubat, on February 24, 1920, of sufficient mental capacity to make a will? Answer. No.

"Second: Was the signature of Vaclav J. Kubat to the document dated February 24, 1920, procured by the undue influence of Joseph L. Kubat and his family? Answer. Yes."

Judgment was entered in accordance with the verdict thus rendered by the jury, and proponents are now appealing to this court.

Appellants make three assignments of error, as follows: First. The court erred in not directing a verdict for proponents on the ground that there was no evidence of undue influence. Second. The court erred in not directing a verdict in favor of the proponents on the ground that there was no evidence of mental incapacity. Third. The court erred in giving instruction No. 5.

The first issue presented for our consideration is: Was the deceased testator of sufficient mental capacity to make a will at the time he did on February 24, 1920? On this issue of fact the jury, being properly instructed, found the testator did not have sufficient mental capacity. We agree to their finding.

On the question of mental capacity to make a will, our view of the qualifications requisite is precisely expressed in the court's instruction No. 5, and we quote it with approval:

"Want of sufficient mental capacity to make a will does not necessarily imply a want of mental capacity in all respects or upon all subjects. A person may be entirely sane upon one subject, or a number of subjects, and yet not have the mental capacity requisite to make a valid will. The kind of mental capacity which the law requires as essential to the making of a valid will is that which relates to the person's property, such capacity as will enable the person to know and recollect the property to be disposed of, to have a reasonable conception of the value and uses of property or money, and a reasonable conception of how property or money may be employed or enjoyed. If a person lacks a capacity and knowledge in relation to money or property, such person is not competent to make a valid will, even though he or she may be entirely rational on other subjects, or have a good recollection of early events or early acquaintances."

This fully explains the philosophy of a testator's attitude and what constitutes true mental capacity to make a will, and shows wherein a mental deficiency lies and mental competency rests. The instruction is in accordance with the rules laid down in such cases as *Brugman v. Brugman*, 93 Neb. 408, and *Hacker v. Hoover*, 89 Neb. 317.

Thus it is plain what this court determines as mental capacity to execute a valid instrument. There is no question about the law of this state on that subject. Applying these principles to the instant case, it plainly appears of record that on February 24, 1920, the deceased testator did not have sufficient mental capacity to make a valid will, remembering those to whom he was under obligation, the amount and extent of his property, where it was located, and its nature and character. Such was shown in the record, and that is why the jury answered that the testator did not have sufficient mental capacity. He was, at the time, feeble and helpless, stricken with paralysis, his second stroke. The jury

were correct in answering that question in the negative. We have no criticism to make about the instruction or the special finding, and say they found correctly on the facts.

In Underhill on Wills, sec. 125, it is said: "The mental and physical capacity of the deceased is to be considered in determining what degree of influence will vitiate his will. * * * The will of one whose independence has been weakened by indulgence in dissipation, or whose stamina, physical or mental, has been broken by illness or old age, may be easily overcome. * * * Every case depends wholly upon its own particular facts and attendant circumstances."

The next question for our consideration is one of undue influence, which is closely allied with the testator's weakness of body and mind. The finding of the jury is sustained by certain facts and the inferences therefrom which they bear to the whole subject. The intermeddling with testator on subjects calculated to harass and annoy him, hurrying him purposely to make a will without proper deliberation, is considered undue influence.

"The question whether there was fraud or undue influence in procuring the will, on the part of the plaintiff, and whether the will was executed by the testator without a knowledge of its contents are questions of fact within the exclusive province of the jury, which includes the credibility of witnesses; and the court is not at liberty to review and revise the action of the jury, unless there was not sufficient evidence to sustain a verdict against the will." 28 R. C. L. 405, sec. 417. See, also, *Blume v. Hartman*, 115 Pa. St. 32, 2 Am. St. Rep. 525, and note, p. 532.

The testator at the time of his death on February 29, 1920, was about 83 or 84 years old. He was a Bohemian by birth, and had lived in Cedar Rapids, Iowa, for years. His family consisted of Mary Lenicek, daughter, Joseph L. Kubat and Charles H. Kubat, sons. After the death of his second wife he lived at different places, staying

with his children part of the time and also living among his Bohemian friends.   At the time the will was executed, February 24, 1920, and at the time of his death, he was at the home of his son, Joseph L. Kubat, in Omaha.  Some two weeks before the execution of the will the testator was stricken with paralysis, his second stroke since 1916.

Within a week of the time the will was made, Joseph L. Kubat borrowed a business form book from Mr. Kratky one of the subscribing witnesses.  A form was selected and was used by Mrs. Porter, Joseph L. Kubat's daughter, in writing the will.  The will gave to Mary Lenicek and Charles H. Kubat $1,000 each, to Joseph L. Kubat's wife and three children $1,000 each, and to Joseph L. Kubat the residue of the personal estate.  There was no real estate.

Witnesses testified that Joseph propped the old man up in bed and gave him pen and ink to sign the will.  Both subscribing witnesses testified that the document was not read aloud nor by Vaclav J. Kubat while they were there.

On the night before the execution of the will, Charles H. Kubat was called to Joseph's house to draw his father's will.   Joseph produced a memorandum as to how he said the testator wished the estate to be divided. According to the memorandum, Charles H. Kubat and Mary Lenicek were to receive $100 each, otherwise the memorandum provided for bequests in the same amounts and to the same people as did the will.   At this point the testimony of Charles H. Kubat is as follows:   "Q. Now, tell the jury just what you said when Joe gave you that list for that kind of a distribution.  A. When Joe handed me that list, I looked it over, and father was lying there in bed, with his feet toward the north and his head toward the south, and I was right in the middle of the bed, in front of him, Joe right to the south of me. When I looked at it, I was surprised, and I said to Joe, 'Joe, what does this mean, $100 to me and $100 to Mary? Why, you don't mean that, Joe?'   He was half crying,

and he says; 'They,' pointing to his wife and children in the next door, 'They want it that way.' 'Why,' I said, 'Joe, it is not what they want, it is what father wants here.' And I then turned to father, and we talked Bohemian. Q. Did you and Joe talk Bohemian in that conversation? A. Yes, sir; every word. Q. What did you say to your father? A. I said to father, 'He wants to give $100 to sister and $100 to me, and why is he going to get 108 times more than me and 108 times more than my sister?' My father reached up and took hold of me and said, 'Charley, Charley, that cannot be. That cannot be.' I said, 'Father, you have a right to give me $100 and I would have to be satisfied, and I would be satisfied, if that is what you want.' He says, 'Charley, that cannot be, you must have your share and sister must have her share, and Joe his share.' Joe was standing there, and I said, 'Joe, you heard what father says.' And he said, 'They want it.' 'Joe', I said, 'it is not what they want, it is as father wants. If father wants to give me $1 only he has a right to do it, but he don't want it that way.' Q. Is that all that was said? A. That is about all, except I said to father; 'If you want me to make the will the way Joe has it here, I will do it.' He says, 'No; it must not be that way.' Q. What was done or said, if anything, with relation to some notes? A. Then Joe went to the back of the bed on the end of the bed where—I thought yesterday that the notes were in the trunk, but, since Joe has mentioned it, I remember he took them out of father's clothes—he got them out of father's pocketbook out of some clothes back of the bed. Q. The clothes were hanging on the bed? A. Yes; on the back of the bed, and he went to them and brought out these three notes. Q. The same three notes that you spoke of? A. The $2,000 note, the $1,300 note, and the $1,000 note. Q. And what did he say to you? A. He brought them out and showed them to me. I had never seen them before, and there was another for $2,000.

In re Estate of Kubat.

He handed that to me. Joe said, 'I want to have father assign these notes over to me.' Q. In the presence of your father? A. Yes. Q. And what was said? A. I said, 'Joe, that is father's property, not your property.' Q. What did he say? A. Joe said, 'Well, I thought I would have him assign them over to me.' *.*.* Q. Did Joe tell you that night that he had bought them a week before for $5 a piece? A. No; I never heard of that before until yesterday."

This tends to show what influence Joe's family had in making and executing this will; that is, they were doing it, and not the old man. The will is not the testator's as such, as a matter of law and fact.

In *Carroll v. Hause,* 48 N. J. Eq. 269, the court said: "Against a beneficiary having a testator under his control, with power to make his will the will of the testator, especially in a case where the testator has made an unnatural disposition of his property, the law presumes undue influence, and puts upon the beneficiary the burden of showing, affirmatively, that when the testator made his will he did not exercise his power over the testator to his own advantage and to the disadvantage of others having an equal or superior claim upon the bounty of the testator."

In *Purdy v. Hall,* 134 Ill. 298, the court said: "Naturally, the mind sympathizes with the body in that which debilitates, and, even when not otherwise impaired, it may become so wearied from long continued, serious and painful sickness that it is willing to purchase rest and quiet at any price, and when in that condition it is susceptible to undue influence, and is liable to be imposed upon by fraud and misrepresentation. The feebler the mind of the testator, no matter from what cause—whether from sickness or otherwise—the less evidence will be required to invalidate the will of such person."

See, also, *Hegney v. Head,* 126 Mo. 619; *Sheehan v. Kearney,* 82 Miss. 688; *Whitelaw's Exr. v. Sims,* 90 Va.

588; *Miller v. Miller*, 187 Pa. St. 572. These cases were cited with approval by our court in the case of *In re Estate of Paisley*, 91 Neb. 139, and they are again in point, being applicable to the instant case, because appellants fall far short of satisfactorily sustaining the burden of proof imposed upon them by settled rules of law.

The testimony on the question of undue influence, as well as mental capacity of testator, was conflicting, in many particulars in hopeless conflict. We conclude that the attending facts and circumstances leading up to the making of the will, the provisions of the will itself as being unnatural and unjust, Joseph L. Kubat's obtaining $4,300 in promissory notes for a consideration of only $11, the four members of Joseph L. Kubat's family receiving $1,000 each, the apparent influence of Joseph L. Kubat and his family, all taken together, point clearly and unmistakably to the correctness of the jury's findings. The case abounds with evidence of suspicious circumstances and is suggestive of fraud. By force of these circumstances and by force of truth portrayed in the record, nothing else is imposed upon us save to enforce the verdict of the jury and the judgment of the lower court by affirmance.

AFFIRMED.