IN RE ESTATE OF ELLA GOIST.
MINNIE R. EWING, APPELLEE, V. MABEL L. GILBERT ET AL.,
APPELLANTS.

IMPLEADED WITH WEST NEBRASKA METHODIST HOSPITAL,
APPELLEE.
18 N. W. 2d 513

FILED APRIL 27, 1945.   No. 31871.

*Mothersead & Wright* and *J. L. Grimm*, for appellants.

*Curtis O. Lyda, W. F. McGriff, F. J. Reed* and *Neighbors & Danielson*, for appellees.

Heard before SIMMONS, C. J., PAINE, CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is a will contest tried before a jury in the district

court. The verdict was for the proponents admitting the will of Ella Goist to probate. Contestants appeal.

Ella Goist departed this life September 18, 1943, leaving an estate of the approximate gross value of $250,000. The residue, after the bequests are paid, would be of the gross value of approximately $200,000. The will named Minnie R. Ewing as executrix and residuary devisee and legatee. The issues tried in the district court were: (1) That the testatrix lacked testamentary capacity to make the will; and (2) that the part of the will giving Minnie R. Ewing the residue of the estate was obtained by undue influence. The next of kin and heirs at law are a nephew and nieces residing in Ohio, and the contestants, the children of a deceased brother, residents of Missouri. The Nebraska Children's Home Society and the West Nebraska Methodist Hospital, legatees under the will, appear also as proponents.

The contestants assign as error that the verdict is contrary to the evidence. The provisions of the will, in so far as need be considered, provide in substance that the testatrix, being mindful that the will of her brother, Daniel Wooldridge, contained substantial bequests to relatives, made certain bequests to a favorite sister, nieces and a nephew and to charities which need not be enumerated.

Paragraph No. 6 provides: "I give, devise and bequeath to my very good friend, Minnie R. Ewing of Gering, Nebraska, all the rest, residue and remainder of my estate, real, personal, and mixed, wherever situate, to be hers absolutely. In doing this, I am not unmindful of my many relatives who are not mentioned herein and also of those who may feel the insufficiency of my bounty. Minnie R. Ewing has been my trusted and helpful friend for many years; she has assisted both myself and my deceased brothers, John and Daniel, and is now devoting a very considerable portion of her time to helping me. As further consideration, I am expecting Minnie R. Ewing to take care of me during the remainder of my natural life as she has done in the past and as I may request."

This estate had its origin in the frugality and business

abilities of two bachelor brothers, Daniel and John Wooldridge, who for more than 50 years engaged in ranching, farming, purchasing and holding real estate, and lending money. They worked together and were inseparable in business and companionship. In 1917 Ella Goist, their widowed sister, came to live with them to look after their welfare and keep house for them. In 1925 John Wooldridge died, leaving an estate valued at $73,320.20, $24,000 of which he bequeathed to relatives, the residue to his brother Daniel and sister Ella Goist. In December, 1939, Daniel died, leaving an estate of $175,765.50. He bequeathed to relatives the sum of $20,000, and made certain bequests to charities, in the event his sister Ella predeceased him. Most of the same charities are included in the will of Ella Goist. The wills of the two brothers, especially with reference to bequests to relatives, in great measure, explain the desire of the testatrix to pattern her will after that of her brother Daniel.

During December, 1940, Ella Goist and Minnie Ewing contacted the county judge, and Ella made inquiry about the preparation of a will. The judge was not in position to assist her at this time. However, on January 9, 1941, after the judge had entered the practice of law, the two went to his office where Ella made inquiry about making a will. She accompanied the attorney into another office where the matter was discussed, and Ella informed him she desired to make a will to conform to that of her brother Daniel. It appears she did not have a copy of Daniel's will and the attorney told her he would obtain one later. Thereafter, a copy of Daniel's will was read to her. The attorney wanted to know what property she desired to leave her relatives. She made a complete explanation, to the effect her relatives had received a considerable amount of money from the estates of her brothers and she wanted the will to disclose why she did not give her relatives more. A work sheet was prepared and the charities to receive bequests were enumerated; the amount was $30,000. Later she went alone to the attorney's office and wanted to reduce the residuary

legatee's share by $5,000, believing she was giving such legatee too much. A charity was selected to receive such bequest.

Minnie Ewing and her husband, John, were friends and neighbors of the Wooldridge brothers during their lifetime since 1910, transacted business with them and on occasions were in their home. Minnie Ewing became acquainted with their sister Ella in 1917. For more than 20 years, during emergencies such as illness or death, she would always help by going to their home, staying and working and comforting them. Through this association she became a companion of Ella, helped her, and accompanied her to civic and social functions and on occasions when she transacted business. On about the 16th of March, 1940, Ella Goist asked Minnie Ewing to come and live with her during her lifetime, and if she would do so, she would be remembered in her will, and it would be enough so that she could afford to come. Minnie Ewing discussed the matter fully with her husband, and on March 18, 1940, gave Ella her answer. On June 20, 1940, she moved in permanently and remained until Ella Goist's death.

There were four witnesses to the will, consisting of the president of the bank where the Wooldridge brothers and Ella had transacted their business, the cashier of the same bank, a merchant with whom she had transacted business, and the attorney who drafted the will. All of these witnesses detailed their acquaintance with her, conversations had and business transacted with her, and gave as their opinion that at the time of executing the will she was able to transact business, knew the nature of the act she was performing, and was active for her age of 81 years.

"In Nebraska there is no statutory requirement that a will be read to the testator or to the witnesses thereto prior to its execution. * * * Where a will, written in the presence of the testator according to his dictation, is executed according to the statute, it is valid though not read to or by him. *Hess' Appeal*, 43 Pa. St. 73, 82 Am. Dec. 551." *In re Estate of Bose*, 136 Neb. 156, 175, 285 N. W. 319.

The foregoing constitutes a brief summary of the evidence offered by the proponents on testamentary capacity in making their *prima facie* case.

The contestants' evidence, for the most part, is directed to undue influence, on the part of Minnie Ewing, exerted on the testatrix. We briefly set out the material parts thereof: The record discloses that from July 1, 1938, until the latter part of May, 1940, one Cecil Irvin, now deceased, and his sister Anna Kilgore, lived in the tenant house and were employed on the Wooldridge place. The sister testified that during this period of time Minnie Ewing made frequent visits to the place, and upon occasions would stay nights, and was not desirous of having Anna around at such times; that Ella Goist resented Minnie Ewing's visits and often spoke about them, telling Anna she did not want to be alone with Mrs. Ewing, and Anna should stay with her on such occasions. After these visits, Mrs. Goist would develop swooning spells and believed she conversed with her deceased brother Daniel about what she had done that was wrong, and he would advise with her and admonish her not to loan any more money to the Ewings. She testified that Ella Goist was preparing to make a will, and wrote to some relatives in Missouri for the names of nephews and nieces she wanted to remember; that she desired her relatives to have the property she left, and spoke of giving Anna a house in Gering and $1,000 a year as long as she lived; that Anna and her brother left because Minnie Ewing told them Mrs. Goist had employed a better man, and when Mrs. Goist heard they were leaving she cried and did not want them to go. The witness gave as her opinion that Ella Goist was not able to transact business. Thereafter, for about 60 days, one Elliott worked on the ranch. He was succeeded by Louis Poppert and his wife, Dorothy.

Louis Poppert testified in substance that on or about Christmas time while he was living in Oxford, Nebraska, he received a letter from Dwight Ewing, a son of Minnie Ewing, stating that Ella Goist needed a hired man. He and his wife immediately investigated, but found there was no

employment at that time. Eventually, however, John and Minnie Ewing were instrumental in obtaining such employment for them, and they moved into the tenant house on the ranch, November 9, 1940, and remained there until their employment terminated in March, 1942. During this time Minnie Ewing would come and stay nights, and in the forepart of 1941 moved in with Ella Goist permanently. Part of his duties was to drive for Mrs. Goist on occasions. When Minnie Ewing moved in, she took over the driving and informed him he should not take Ella to town, as she was always getting things mixed up which would have to be straightened out, and if Ella wanted to go to town, that Poppert should call her. He told her that he could not do so because Mrs. Goist did not want him to, and he informed Mrs. Goist of this conversation to which she replied: "It looks to me like we could go without taking all of the neighbors along." Later Mrs. Ewing told him that "she had threatened Mrs. Goist that if she didn't leave the business affairs alone that the people would soon have her in the bug house for making so many mistakes." She also told him that Ella Goist had promised her some of her real estate if she would stay with her, and Minnie Ewing said: "I am seeing to it that I get it. I am going to get it if I have to come over here and live." She further told him that she had about talked Mrs. Goist "in the notion of changing lawyers." Mrs. Ewing gave the orders about the work. He further testified that Mrs. Goist told him she wanted someone to live with her for company and make a home for her, that Minnie Ewing had her own home and should stay in it; further, that Ella Goist was very forgetful and would ask the same thing over, four or five times in an hour's time, would offer to pay him when it was not payday. The ranch consisted of about 1,000 acres, but Mrs. Goist did not know whether it was 200 acres or 160, or how many cattle she owned.

Dorothy Poppert testified Mrs. Goist did her own housework, prepared her own meals, and that in February, 1941, she had attacks which would make her "rather unconscious

and then she would be sick at her stomach." Her further evidence corroborated that of her husband.

A tenant, George Rien, testified he farmed one of the Goist places in 1940 and 1941. At first he saw Mrs. Goist quite frequently, but later when Minnie Ewing moved in with her he had two bosses, and Mrs. Ewing became the manager and if he did not do as she desired, she would get Mrs. Goist to tell him to do as Mrs. Ewing had directed. In the fall of 1940, he complained to Mrs. Goist and she informed him that Mrs. Ewing had no business running her property. During the second year of his tenancy Ella Goist was ill more frequently, and Mrs. Ewing told him that Mrs. Goist was having spells, and if they continued she would lose her mind.

A neighbor, Mrs. Miletus Ouderkirk, who lived in the vicinity all of her life, testified that in 1940 she would see Mrs. Goist about every two weeks, and Mrs. Goist was very forgetful and at times did not know her. In 1939 she called on her for a Red Cross donation, Mrs. Goist was alone and asked who she was, and told her that she was alone, and missed Daniel so much, that " 'he used to be right on the other side of the table from me, or out around the place, * * * .' * * * 'Now, I am just a prisoner in my own home.' * * * 'The folks I have here go early and come back late.' "

William Oberlander, who formerly lived with his parents about a half mile southwest of the Wooldridge ranch, testified he started to drive for Daniel two months before his death, and drove for Ella until the middle of March, 1941, that Poppert drove some, but Mrs. Ewing took over the driving. In February, 1941, he saw Mrs. Goist faint. She remained unconscious 15 or 20 minutes, and he had seen her when she would suddenly get sleepy for a short period and then be awake and become apparently normal. He noticed on several occasions she was forgetful, especially so when he would make purchases for her with his own money and she would repay him, and would want to make settlement again. She did not seem to know where her renters lived and in later years became childish. However, the testimony of this witness does disclose that she transacted business

and that he drove where she directed him. He had made a suggestion that some of her relatives should come and live with her, and in August, 1941, she told him that as long as she was able, she was going to keep the ranch, and when she had finished with it the Sprinkle family, her relatives, could have it.

Thomas E. Wooldridge, a nephew and contestant, testified to two letters written by Ella Goist to his mother, making inquiries about relatives to whom she wanted to leave her property. His wife testified she answered the letters for the mother. The first letter was written in August, 1938, the latter in the fall of 1940. Thereafter there seems to be no correspondence between the parties.

Doctor Gentry testified in rebuttal for proponents. His acquaintance with Ella Goist began in 1919, while employed by her brothers, and he had been in her home on several occasions. In November, 1940, she came to his office, complained of attacks of unconsciousness which subsequently turned out to be a serious heart disease described as Stokes-Adam's syndrome, a disease of the coronary blood vessels of the heart that makes a characteristic trend of symptoms which is mainly the type of unconsciousness with which she was afflicted. The trouble would manifest itself from time to time by a fainting spell, and except for her heart, she was in very good physical condition. After she had had one of these spells she would hardly believe it, and would be mentally alert. He treated her again on February 17, 1941, found her physical condition good, with the exception of her heart; stated that on January 14, 1941, the date of executing the will, she had no mental disease and was able to transact business. In 1940 he talked to her about her relatives. She told him she did not particularly care for her relatives, that Minnie Ewing was the best friend she ever had and took very good care of her, and that she was glad that Mrs. Ewing was willing to stay with her. She also told the doctor that she had made a will and tried to leave her money where she felt it would do the most good, and tried to follow Daniel's will.

In addition to a part of the testimony of Minnie Ewing previously summarized, she, by letters, made answer to inquiries made by a relative of Mrs. Goist. The substance of the letters is to the effect that Ella Goist was peculiar. In explaining this she wrote about having obtained a good Christian couple to work for reasonable wages, but Ella Goist had changed her mind and told her, "Dan says this is the best man we ever had and for me to keep him"; that her attorney could see she was not capable of transacting business. Some mention was made about a rental property for which Mrs. Goist wanted more rent, and the tenants moved. Mrs. Ewing felt that it would be more advisable to keep the property rented. One Sunday Daisy Ewing called Mrs. Goist to go to church. She declined, giving as the reason that she would have to pay her taxes that day. Exhibit 36B appears to be an addition to the letter. It is to the effect that Mrs. Ewing talked to Mrs. Goist over the telephone to find out how she was feeling. She replied that she was all right and "tough as ever." She did not see any change in Mrs. Goist. She then wrote, "I'll keep pretty close tab on things over there and I have your address. Will write you if I see any change or if she gets sick."

Other matters to which Mrs. Ewing testified will be found in a summation as to what the proponents' evidence discloses.

A summation of the contestants' evidence is to the effect that Minnie Ewing, through her acquaintance with the Wooldridge brothers and later their sister Ella Goist, by her frequent visits and her presence during illness and at the time of Daniel's death, by helping and her companionship, ingratiated herself to such an extent that she became indispensable to Ella Goist who is referred to by the contestants as an old, feeble and incompetent person, and as a consequence, Ella Goist asked her to come and live with her, and orally promised and agreed that if she would do so it would be worth her while. After having exerted such influence over Ella Goist, and once moved in permanently, she took full charge of handling the ranch, procured the dis-

charge of Cecil Irvin and thereby getting rid of Anna Kilgore; negotiated the employment of Poppert, sought to control him, directed what he should do with reference to driving for Mrs. Goist; informed him she was promised some real estate and was going to get it if she had to move in; further told him if he would help her she would help him; that throughout the evidence it will be observed that Minnie Ewing controlled the employment of the help on the ranch and dispensed with the services of those who failed to suit her purpose. When there was no hired help she and Ella would do the work on the ranch, and she, well knowing Ella's physical condition, coupled with her age, would not stand the strain of such work. Further, she had borrowed money from Ella Goist, claimed to have repaid it but was unable to show in what manner. She also became a co-owner of war bonds, on one occasion in the amount of $10,-500; criticized her in letters written to a relative, saying also she would keep close tab on things; induced her to change attorneys; constantly accompanied her when she was preparing to and making her will, and when she was transacting business with tenants and others, thereby controlling her every act and deed.

Contra, the proponents' evidence summarized, discloses that Ella Goist managed her own business, in fact was insistent upon doing so. She designated Minnie Ewing as executrix of her estate rather than have a businessman, and gave her reasons therefor. Her business was quite extensive, and she managed it without dictation from any one. She made leases between herself and tenants; figured the landlord's share of the rent; made most of her own deposits in the bank, except those made by her attorneys; loaned money, taking notes and demanding security; purchased material to make improvements and repairs on her properties; managed an elevator, required the employee to turn over the canceled checks to her from this business, and made inquiries on those she questioned. She adjusted litigation in a transportation company in which she was interested. She was the executrix of Daniel's estate consist-

ing of more than $175,000 and attended the business incident to her official position with reference to such estate; took an interest in the market, taxes and current events; attended business, civic and social meetings in which she was interested.

Ella Goist often expressed herself that she was not particularly interested in her relatives, they had no interest in her and were of little or no help to her; that Minnie Ewing was her best and trusted friend. It is explained that Minnie Ewing was made co-owner of the war bonds by direction of Mrs. Goist when she was informed that the government required two names on the bonds. In the absence of help on the ranch, Minnie Ewing carried on the work such as fixing fences, watering cattle, taking salt to them, milking the cows and doing considerable riding to count the cattle, and Ella Goist helped as much as she was able.

In a will contest on appeal to the Supreme Court, the issues of fact are determined by the sufficiency of evidence to sustain the verdict. Having this rule in mind, we have searched the record diligently and on the question of mental competency we find that there was sufficient evidence to sustain the verdict.

The mental capacity of a testator is tested by the state of his mind at the time he executed his will. If a testator knows the extent and character of his property, the natural objects of his bounty and the purposes of his devises and bequests, he is mentally competent to make a will. *In re Estate of Laflin,* 108 Neb. 298, 187 N. W. 885. See, also, *In re Estate of Frazier,* 131 Neb. 61, 267 N. W. 181; *In re Estate of Bose,* 136 Neb. 156, 285 N. W. 319.

The evidence of a number of witnesses was offered in rebuttal to the contestants' evidence, consisting of business and professional people of Gering who testified and gave their opinions as to the mental capacity of Ella Goist at the time she executed her will. Among these witnesses were her family physician; an employee of the bank where she transacted business and later employed in the Safeway Store where she traded; a potato broker; an editor; a coun-

ty road employee; a druggist and a clergyman; all in addition to the testimony of the subscribing witnesses of the will heretofore set out. Several tenants who occupied her different properties testified to conversations had with her relative to their tenancy. These witnesses related that she drew leases, purchased material for improvements and repairs for property they occupied, and made rent settlements on crops. An elevator operator employed by her testified that she would go over the canceled checks and call attention to those that were irregular. Old friends, acquaintances and neighbors gave their opinion that she possessed the mental capacity to make her will on January 14, 1941. These were friends of long standing. We deem it unnecessary to detail this evidence, and suffice it is to say all of the conversations, transactions and business had between such witnesses and testatrix, occurred at the time preceding the making of the will, at the time the will was executed and thereafter until her death. It is apparent that Mrs. Goist was able to and did transact business up to almost the day of her death. See *In re Estate of Bayer,* 119 Neb. 191, 227 N. W. 928; *In re Estate of Kerr,* 117 Neb. 630, 222 N. W. 63; *In re Estate of Kubat,* 109 Neb. 671, 192 N. W. 202, citing and following *In re Estate of Laflin, supra.*

A testator may dispose of his property as he pleases. The law does not require that he recognize his relatives therein, nor does it put any obstacle in the way of the aged or infirm in making disposition of their property by will; provided, only, that their mentality conforms to the accepted tests at the time of the execution of such testamentary instrument. In *In re Estate of Bose, supra,* it is said: " 'It is one of the painful consequences of extreme old age that it ceases to excite interest, and is apt to be left solitary and neglected. The control which the law still gives to a man over the disposal of his property, is one of the most efficient means which he has in protracted life to command the attentions due to his infirmities.' "

The contestants, having affirmatively pleaded undue influence, have the burden of proof to prove undue influence by a preponderance of the evidence.

The elements necessary to be established to warrant the rejection of a will on the ground of undue influence are: (1) That the testator was subject to such influence; (2) that the opportunity to exercise it existed; (3) that there was a disposition to exercise it; and (4) that the result appears to be the effect of such influence. *In re Estate of Hagan*, 143 Neb. 459, 9 N. W. 2d 794; *In re Estate of Bowman*, 143 Neb. 440, 9 N. W. 2d 801; *In re Estate of Heineman*, 144 Neb. 442, 13 N. W. 2d 569.

In *Gidley v. Gidley*, 130 Neb. 419, 265 N. W. 245, quoting from 31 C. J. 1183, it is said: "All that can be said, in the way of formulating a general rule on this subject, is, that whatever destroys free agency, and constrains the person whose act is brought in judgment, to do what is against his will and what he would not have done if left to himself, is 'undue influence', no matter by what means the control is exercised, whether the control is exercised by physical force, duress, fraud, threats, importunity, or any other species of mental, moral or physical coercion. The means employed, the extent or degree of the influence, or by whom the influence is exerted, is immaterial, for the test always is, was the influence, whether slight or powerful, sufficient to destroy free agency, so that the act put in judgment was the result of the domination of the mind of another rather than the expression of the will and mind of the actor?" See, also, *In re Estate of Keup*, 145 Neb. 729, 18 N. W. 2d 63.

Having in mind the necessary elements to be proved by the contestants in this case by a preponderance of evidence, and the definition of undue influence, suffice it is to say that the jury had the benefit of all of the evidence, weighed it and resolved the question of undue influence against the contestants. Unless the verdict is clearly wrong, and it is not, it will not be disturbed.

The contestants offered instructions Nos. 3, 10, 11 and 12. Instructions Nos. 3 and 10 are to the effect that a confidential relationship existed between the testatrix and Minnie Ewing; that there was an unnatural distribution of the

property, and the age and physical condition of the testatrix were matters which the jury were at liberty to infer, if they found them to be facts of undue influence. Instructions Nos. 11 and 12 were to the effect that undue influence would rarely be established by direct proof, but was a matter largely of inference and facts surrounding the testatrix.

Error is predicated upon the court's refusal to give the requested instructions. The instructions given by the court substantially cover all matters contained in the requested instructions Nos. 3, 10 and 12. Requested instruction No. 11 contained the language "undue influence can rarely be established by direct proof, and accordingly it may be proved by indirect evidence and by proof of facts by which undue influence may be inferred." While the court did not use such language, there are many matters set out in the instructions given by the court that adequately cover most any reasonable or legitimate inference the jury might desire to draw from the evidence.

The requested instructions do not attempt to shift the burden of proof on undue influence, but adhere to it as required by *In re Estate of Hagan, supra*. However, the contestants cite *In re Estate of Hagan; supra,* as follows: "The propriety of a rule which says that when the evidence of the party having the burden of proof is sufficient to make a *prima facie* case gives rise at that point to a presumption of the existence of a fact, we do not question. Moreover we do not question the propriety of a rule which states that from proof of the existence of certain factual elements the existence of an ultimate or issuable fact may be inferred or presumed."

Assuming a presumption would arise that a confidential relationship did exist as claimed by the contestants, then the following is applicable: " 'A presumption is not evidence of anything and only relates to a rule of law as to which party shall first go forward and produce evidence sustaining a matter in issue. A presumption will serve as and in the place of evidence in favor of one party or the other until *prima facie* evidence has been adduced by the opposite par-

ty, but the presumption should never be placed in the scale to be weighed as evidence.' * * * ." *In re Estate of Kajewski,* 134 Neb. 485, 279 N. W. 185; *Bohmont v. Moore,* 138 Neb. 784, 295 N. W. 419, 133 A. L. R. 270. " 'The better reasoned authorities hold that a presumption is not evidence of a fact, but purely a conclusion, having no probative force, and designed only to sustain the burden of proof until evidence is introduced tending to overcome it. * * * When evidence is introduced rebutting the presumption, the presumption disappears, leaving in evidence the basic facts which are to be weighed.' " *Bohmont v. Moore, supra,* and cases cited therein.

While it is a generally accepted view that the mere existence of confidential relations between a testator and a beneficiary under his will does not raise a presumption that the beneficiary has exercised undue influence over the testator, the relationship between the two may be considered with all of the other facts and circumstances in the case, in determining undue influence. *In re Estate of Bowman, supra.* The court did not commit prejudicial error as contended for by contestants.

Contestants make a point that the will in the instant case provides for an unnatural distribution of the property.

"No right of the citizen is more valued than the power to dispose of his property by will. No right is more solemnly assured to him by the law. Nor does it depend in any sense upon the judicious exercise of that right. It rarely happens that a man bequeaths his estate to the entire satisfaction of either his family or friends. The law wisely secures equality of distribution where a man dies intestate, but the very object of a will is to produce inequality * * * . In this country a man's prejudices form a part of his liberty. He has a right to them. He may be unjust to his children or relatives. He is entitled to the control of his property while living, and by will to direct its use after his death, subject only to such restrictions as are imposed by law. Where a man has sufficient memory and understanding to make a will, and such instrument is not the result of undue influ-

ence, it is not to be set aside without sufficient evidence, nor upon sentimental notions of equality. * * * ." *Isaac v. Halderman,* 76 Neb. 823, 107 N. W. 1016. See *In re Estate of Bose, supra.*

The contestants in the instant case are collateral heirs. The testatrix had never seen them nor talked to them, nor did they ever visit her home, or write or contact her. There is nothing to show that they in any manner endeared themselves to her, in fact, they paid no attention to her and little if any to the letters that were written to their mother by her.

The affection and gratitude which arises in one who is a beneficiary of another's love and attention should not be considered, in absence of definite evidence, the result of wrongful influence simply because the one who serves is not a relative. *Brown v. Jacoby,* 55 Ohio App. 250, 9 N. E. 2d 693; *Estate of Shields,* 49 Cal. App. 2d 293, 121 Pac. 2d 795.

In *Sierkermann v. Knight,* 57 S. D. 420, 233 N. W. 274, the court said: "While it may be more natural to give to relatives, however distant, than to give to strangers, it is not more natural to give to such relatives, where they are not acquainted or associated with testator, than it is to give to close friends and acquaintances, especially if such friends extend aid in time of need." See, also, *In re Estate of Kajewski, supra; In re Estate of Dovey,* 101 Neb. 11, 162 N. W. 134; *Isaac v. Halderman, supra; In re Estate of Bose, supra.*

Under the circumstances of the instant case, the will is not unnatural.

Several non-expert witnesses, which we have noted, testified that the testatrix was of sound mind at the time the will was executed. Contestants predicate error on the admission of this testimony, contending that most, if not all, of the witnesses lacked the necessary qualifications to testify.

In *Clarke v. Irwin,* 63 Neb. 539, 88 N. W. 783, the court said: "It seems to be a well-settled rule that non-expert witnesses who show a personal acquaintance with the person alleged to be insane, extending over a considerable period of

time, and are shown to have a sufficient acquaintance to be able to form an opinion, after detailing to the jury the facts and circumstances upon which such opinion is based, are permitted to testify whether in their opinion such person is sane or insane. The established doctrine is that if the witness has sufficient opportunity for observation to enable him to form an opinion upon the question of the sanity of the person, then he is a competent witness, and may be permitted to testify to such opinion. This rule seems based upon sound reason. In fact, if the rule were otherwise, grievous hardship and injustice might frequently result. Cases might, and frequently do, arise in which medical experts differ as to whether the person in question is sane or otherwise. In such cases, in the absence of a rule permitting non-expert witnesses to testify, the jury might not be able correctly to determine whether the person was or was not insane. The qualification of the witness to give his opinion of the sanity of a person is a question resting very largely in the sound discretion of the trial court."

The above rule was followed in *Kehl v. Omaha Nat. Bank*, 126 Neb. 695, 254 N. W. 397; *Bankers Life Ins. Co. v. Aron*, 133 Neb. 187, 273 N. W. 280; *In re Estate of Steininger*, 139 Neb. 284, 297 N. W. 159; *Torske v. State*, 123 Neb. 161, 242 N. W. 408, citing *In re Estate of Wilson*, 78 Neb. 758, 111 N. W. 788.

From an examination of the testimony of witnesses in the instant case on this subject in connection with the foregoing cases, and in addition reviewing the cases cited below, we hold that the witnesses possessed the necessary qualifications to testify. *In re Estate of Frazier, supra; Seebrock v. Fedawa*, 30 Neb. 424, 46 N. W. 650; *Carter v. Gahagan*, 102 Neb. 404, 167 N. W. 412; *In re Estate of Hieneman, supra; In re Estate of Witte*, 145 Neb. 295, 16 N. W. 2d 203, 17 N. W. 2d 477. In most instances their acquaintance was of long standing or their association close, while in other instances the acquaintanceship was sufficient to enable the witnesses to form an opinion, and the witnesses had sufficient opportunity for observation to enable them to form

such opinions. In some instances there was no objection to this testimony and in one instance no ruling on an objection and no motion to strike the testimony thereafter. While the clergyman's testimony covered a period from a month after the will was executed until two years thereafter, we find no prejudicial error in admitting his testimony.

Contestants complain of instruction No. 7. This instruction is rather long and it would serve no useful purpose to set it out. The court informed the jury in determining the issue of undue influence, " * * * You may, if you find them material to such determination, and find evidence bearing upon the same, may inquire from the evidence into any of the following considerations, to-wit: * * * ." Then the court sets forth a number of matters which the jury might consider. Thereafter the instruction continues: "In addition to the matters above mentioned you may take into consideration any and all facts and circumstances that you may find shown in the evidence. In mentioning the above enumerated matters, the Court has not attempted to outline all of the matters that you shall consider in determining the issue of undue influence, and the Court has not attempted to say that you shall consider any one or more of the matters mentioned. The Court has not attempted to give any more prominence to any one or more of the considerations mentioned than to any matter for consideration that has not been specifically enumerated. These matters have been mentioned merely to aid you in understanding the nature of the determination to be made by you. It may be that you will find subjects of inquiry as important or more important to your determination of this issue than any of those mentioned, and you may find some or all of those mentioned of more or less importance in such determination."

The contestants select the language from the instruction as follows: "In addition to the matters above mentioned you may take into consideration any and all facts and circumstances," contending that this portion of the instruction, in effect, instructed the jury that it was at liberty to disregard a large volume of the competent evidence bearing

upon the issue involved. Reading this portion of the language in the instruction, and the instruction in its entirety, it is apparent that the court was not telling the jury to disregard any competent evidence, but set forth certain facts and circumstances that might assist and aid the jury in considering the issue of undue influence.

The court further told the jury in instruction No. 7 that certain facts standing alone raised no presumption of undue influence. These facts briefly are: That Ella Goist, by her will, gave more to Minnie R. Ewing than a sister of testatrix and her nieces and nephew; that Minnie Ewing was a companion of Ella Goist and looked after her property and exhibited kindness and respect for and towards her. The contestants' contention is that this part of the instruction withdraws from consideration of the jury certain evidence and puts it in the affirmative, which is tantamount to a finding of law; that Minnie Ewing did exhibit certain respect and kindness toward Ella Goist, when there is evidence to the contrary, and that this was a question for the jury to determine from all of the evidence. We are not in accord with the contestants' conception in such respect, when the instruction is read in its entirety. The court told the jury that although the foregoing enumerated facts or circumstances standing alone were not presumptive of undue influence, yet all of them could be considered by the jury, along with any other circumstances shown in the evidence, in determining the issue of undue influence.

The court properly instructed on the burden of proof in instruction No. 6 and properly defined undue influence in instruction No. 8, and gave certain other matters in connection with the definition.

We do not favor the giving of an instruction that purports to seek out certain evidence or to discern what inferences might be drawn therefrom, for the reason that ordinarily to do so places the court in a position of pointing out to the jury evidence which they might consider most important and paramount to other evidence and sometimes leads to over-emphasis on parts of evidence and under-em-

phasis on other parts thereof. In considering instructions Nos. 6 and 8 in connection with instruction No. 7, we find no prejudicial error in the giving of instruction No. 7.

The contestants complain of instruction No. 5. In this instruction the court detailed a number of matters the jury might properly take into consideration in determining the issue of testamentary capacity. We deem it unnecessary to detail these matters. This type of instruction is not favored, especially when the court by a previous instruction has properly instructed on the burden of proof on the subject of testamentary capacity. In this connection, where instructions as a whole clearly present to the jury the issues of fact and law applicable thereto, harmless error in instructions separately criticized on appeal does not require a reversal of judgment. *Whittaker v. Omaha & C. B. Street Ry. Co.*, 137 Neb. 800, 291 N. W. 275; *Interstate Airlines Inc., v. Arnold*, 127 Neb. 665, 256 N. W. 513.

For the reasons given in this opinion, the verdict of the jury and the judgment of the court thereon is affirmed.

AFFIRMED.